1   BRIAN C. LEIGHTON, CA BAR # 090907
    Law Offices of Brian C. Leighton
2   701 Pollasky Avenue
    Clovis, California  93612
3   Telephone:(559) 297-6190
    Facsimile:(559) 297-6194
4   E-mail: kbarker@arrival.net

5   Attorney for Plaintiff NEIL O'BRIEN

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  NEIL O'BRIEN, an individual,          )   CASE NO. 1:12-CV-02017-AWI-SAB
                                          )
12               Plaintiff,               )   **PLAINTIFF'S OPPOSITION TO**
                                          )   **DEFENDANTS' MOTION TO DISMISS**
13          v.                            )   **FIRST AMENDED COMPLAINT**
                                          )
14  DR. JOHN D. WELTY, in his personal    )   DATE:        **March 4, 2013**
    capacity; DR. PAUL M. OLIARO, in his  )
15  personal capacity; DR. CAROLYN V.     )   TIME:        **1:30 p.m.**
    COON, in her personal capacity;       )
16  DR. VICTOR M. TORRES, in his personal )   CRTRM:       **Two, Eighth Floor**
    capacity; DR. MARIA A. LOPES, in her  )
17  personal capacity; DR. LUZ GONZALEZ,  )   JUDGE:       **Hon. Anthony Ishii**
    in her personal capacity; DR. MATTHEW )
18  JENDIAN, in his personal capacity, and)
    DOES 1 through 25, inclusive,         )   TRIAL DATE:      None
19                                        )
                     Defendants.          )   ACTION FILED:    November 14, 2012
20  _____ )

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

Page No.

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.    LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

III.   MISCELLANEOUS CLAIMS BY DEFENDANTS
       WHICH MUST BE REJECTED BY THE COURT ON A
       MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . . . . . . . . . . . . . . .   4

IV.    DEFENDANTS' CLAIMS THAT PLAINTIFF RECEIVED
       SUFFICIENT DUE PROCESS IN HIS DISCIPLINARY
       PROCEEDING ARE WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

V.     DEFENDANTS' CLAIM THAT O'BRIEN'S FIRST
       AMENDMENT RIGHTS WERE NOT VIOLATED BECAUSE
       THE DISCIPLINE WAS APPROPRIATE, IS WITHOUT MERIT . . . . . . . . . . .   14

VI.    THE DEFENDANTS' CLAIM THAT THE DISCIPLINE
       WAS NOT RETALIATORY IS MERITLESS GIVEN
       THE PROCEEDING BEFORE THE COURT . . . . . . . . . . . . . . . . . . . . . . . . .   15

VII.   DEFENDANTS' CLAIM THAT O'BRIEN'S DECEMBER 1
       AND 2, 2011 ENCOUNTERS WITH FACULTY DID NOT VIOLATE
       HIS CONSTITUTIONAL RIGHTS, IS WITHOUT MERIT . . . . . . . . . . . . . . . .   17

VIII.  THE DEFENDANTS' CLAIM THAT DEFENDANT
       OLIARO'S NEW SANCTIONS ORDER DID NOT
       VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHT IS
       MERITLESS ON DEFENDANTS' MOTION TO DISMISS
       PURSUANT TO RULE 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

IX.    DEFENDANTS' CLAIM THAT ALLEGED HARM
       TO REPUTATION IS NOT A BASIS FOR A 1983 CLAIM
       IS A NON SEQUITUR AND IS MERITLESS . . . . . . . . . . . . . . . . . . . . . . . . .   19

X.     DEFENDANTS' CLAIM THAT O'BRIEN'S CONSTITUTIONAL
       RIGHTS WERE NOT VIOLATED WHEN HE WAS BARRED
       FROM APPLYING FOR STUDENT GOVERNMENT POSITIONS
       AND LEADING A CLUB, IS WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . . .   19

XI.    SINCE PLAINTIFF MADE NO SEPARATE CONSTITUTIONAL
       CLAIM REGARDING O'BRIEN'S PUBLIC RECORD ACTS
       REQUEST, DEFENDANTS' *STRAWMAN* ARGUMENT TO
       THE CONTRARY IS MERITLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

XII.   CONTRARY TO THE DEFENDANTS' CLAIM, PLAINTIFF
       DID NOT ALLEGE A SEPARATE CAUSE OF ACTION OF
       "SELECTIVE ENFORCEMENT" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

XIII.  NONE OF THE DEFENDANTS HAVE QUALIFIED IMMUNITY . . . . . . . . . .   21

XIV.   O'BRIEN SUFFICIENTLY PLEAD A CONSPIRACY
      TO VIOLATE PLAINTIFF'S CIVIL RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . 22

XV.   CONTRARY TO DEFENDANTS TORRES' AND LOPES'
      CLAIM THAT THEY DID NOT ACT UNDER COLOR OF STATE
      LAW, THE FACTS IN THE COMPLAINT ALLEGE OTHERWISE . . . . . . . . . 22

XVI.   DEFENDANTS WELTY AND OLIARO ARE LIABLE FOR
      THE SUBORDINATES ACTIONS, AS SPECIFICALLY SHOWN
      IN THE ALLEGATIONS OF THE FIRST AMENDED COMPLAINT . . . . . . . . . 23

XVII.   O'BRIEN'S CLAIM FOR PRIVATE ATTORNEY GENERAL
      ATTORNEY'S FEES AND COSTS DOES STATE A CLAIM
      FOR ATTORNEY'S FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XVIII.  IF THE COURT DISMISSES ANY CLAIM, LEAVE
      TO AMEND SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

XIX.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ashcroft v. Iqball,*
    556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Bethel School District v. Fraser,*
    478 U.S. 675 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Boos v. Barry,*
    485 U.S. 312 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Bull v. Dardanelle Public School District,*
    745 F.Supp. 1455 (E.D. ARK 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*College Republicans at San Francsicso State University,*
    523 F.Supp.2d 1005 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Corales v. Bennett [and the Ontario-Montclair School District],*
    567 F.3d 554 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Gorman v. University of Rhoda Island,*
    837 F.2d 7 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*Goss v. Lopez,*
    419 U.S. 565 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Hansen v. Black,*
    885 F.2d 642 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Healy v. James,*
    408 U.S. 169 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Krainski v. Nevada ex rel. Board of Regents,*
    616 F.3d 963 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Kyriacou v. Perolta Community College District,*
    2000 U.S.Dist. LEXIS 32464 (D.C. N.D. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Lopez v. Smith,*
    203 F.3d 1122 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*New Jersery v. T.L.O.,*
    469 U.S. 325 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*O.S.U. Student Alliance v. Ray,*
    699 F.3d 1053 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Saxe v. State College Area School District,*
    240 F.3d 200 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Texas v. Johnson,*
    491 U.S. 397 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Tigrett v. Rector & Visitors of University Virginia,*
    293 F.3d 620 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Tinker v. Des Moines Ind. Committee School District,*
    393 U.S. 503 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Lanier,*
    520 U.S. 259 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Playboy Entertainment Group,*
    529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


**FEDERAL STATUTES**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22


**STATE STATUTES**

California Code of Civil Procedure § 1021.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
California Code of Regulations, Title 5 § 41301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
California Penal Code § 632 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## I. **INTRODUCTION**

Plaintiff is and was, at all relevant times, a student at California State University Fresno ("Fresno State"). At all relevant times, the Defendants were employed by Fresno State and were either professors or administrators. Plaintiff sued the Defendants in the Fall of 2012 in the Fresno County Superior Court. The Defendants removed the matter to federal court. By stipulation and court order, Plaintiff filed his First Amended Complaint on January 14, 2013. Defendants have now moved to dismiss the First Amended Complaint ("FAC"). The FAC alleges conduct and activities of the Defendants from the Fall of 2010, when O'Brien enrolled at Fresno State, through the Spring Semester of 2012, with the damages suffered by the Plaintiff continuing and ongoing since then. The FAC alleges various violations by the Defendants of Plaintiff's civil rights – primarily First Amendment rights – protected by the United States Constitution and 42 U.S.C. §§ 1983 *et seq.* Defendants' assault on the FAC is the shot-gun approach, selectively choosing isolated sentences in the FAC, and then attacking that sentence as though it does not allege facts sufficient to state a claim. Every incident in the FAC alleged by O'Brien against the Defendants is prefaced by factual details and allegations showing that the Defendants' motives, intent and actions were not taken for valid University purposes, or because professors actually felt "threatened" or "intimidated" by Plaintiff, but solely to punish, retaliate, silence and ridicule Plaintiff because Plaintiff's political and social point of view were that of a constitutional conservative, the Defendants were liberal, left-leaning, and totally intolerant of not only Plaintiff's point of view but because he was so outspoken about it.

Throughout the Defendants' brief they cite to cases that involve high school and grammar school, student conduct and cite those cases as though they are relevant to a public university campus where students are adults, and where free speech and expressive rights are provided the greatest protections. The Supreme Court has often stated – and was very clear about it – that "'the vigilant protection of constitutional freedoms is no where more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) The United States District Court for the Northern District of California in *College Republicans at San Francsicso State University*, 523 F.Supp.2d 1005, 1015-1016 (N.D. Cal. 2007) summarized supreme court precedent as follows:

> "As our highest court has said 'the college classroom with its surrounding environs is peculiarly the "marketplace of ideas. . .  Indeed, the core

1         principles of the First Amendment 'acquire a special significance in the
2         university setting, where the free and unfettered interplay of competing
        views is essential to the institution's educational mission.'"  (Citation
3         omitted.)"   523 F.Supp.2d 1015-1016.

4 As that same case stated:

5         "While the issues in the case at bar also arise in an educational setting, for
        purposes of the First Amendment analysis there are very important
6         differences between primary and secondary schools, on the one hand, and
        colleges and universities, on the other.   As the courts have often
7         acknowledged, the state does not require higher education and has much
        less interest in regulating it, the students in colleges and universities are
8         not children, but emancipated (by law) adults, and, critically, the mission
        of institutions of higher learning is quite different from the mission of
9         primary and secondary schools. As courts have emphasized, 'the vigilant
        protection of constitutional freedoms is no where more vital than in the
        community of Americans schools [of higher learning].' [Citations to
10         *Healy v. James, supra*]" *College Republicans* at 1015.

11     Even "harassing" or discriminatory speech, although evil and offensive, may be used to

12 communicate ideas or emotions are entitled to First Amendment protections.  As the Supreme Court has

13 emphatically declared, "if there is a bedrock principle underlying the First Amendment, it is that the

14 government may not prohibit the expression of an idea simply because society finds the idea offensive

15 or disagreeable."  Citation to *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Saxe v. State College Area*

16 *School District*, 240 F.3d 200, 209 (3rd Cir. 2001).

17     Of a special significance with respect to Defendant Torres, Lopes, and Gonzales, and their claims

18 that O'Brien's speech was not the reason they called campus police, but because they felt "intimidated,"

19 or "threatened," the Supreme Court made it clear that the government cannot prohibit speech under a

20 "secondary effects" rationale based solely on the emotive impact that its offensive content may have on

21 a listener. *Boos v. Barry*, 485 U.S. 312, 321 (1988); *United States v. Playboy Entertainment Group*, 529

22 U.S. 803 (2000).

23     Any action prohibiting or retaliating against disparaging speech directed at a person's values,

24 personal characteristics or the like "strikes at the heart of moral and political discourse – the lifeblood

25 of constitutional self-government (and democratic education) and the core concern of the First

26 Amendment. That speech about 'values' may offend is not cause of its prohibition, but rather the reason

27 for its protection: 'a principle function of free speech under our system of government is to invite

28 dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates

1    dissatisfaction with conditions as they are, or even stirs people to anger.' *Texas v. Johnson, supra*, 491

2    U.S. 397, 408-409 (1989).

3           Thus, the Defendants claim of no free speech violations by citing to cases irrelevant to the facts

4    of the instant public university case are utterly worthless for purposes of their motion.

5           Another huge fault with the Defendants' motion is that it cherry-picks the facts or allegations that

6    it likes and then claims and defends that the Defendants' motive were innocent, not directed at speech,

7    and not violative of any constitutional rights.

8           Defendants' vehicle of choice in attacking the FAC is its motion to dismiss for failure to state

9    a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  They cannot defend with their own

10   spin.

11                                  **II.  <u>LEGAL STANDARD</u>**

12          The question presented by a motion to dismiss under Rule 12(b)(6) is not whether the Plaintiff

13   will prevail in the action, but whether he has alleged sufficient facts to state a claim that is plausible on

14   its face.  *O.S.U. Student Alliance v. Ray*, 699 F.3d 1053, 1062 (9th Cir. 2012)

15          But in answering the question, the court must assume that Plaintiff's allegations are true and must

16   draw all reasonable inferences in the light most favorable to the Plaintiff.  *O.S.U. Student, supra* at 1061.

17          If the Court were to dismiss any portion of the complaint, the Ninth Circuit has "repeatedly held

18   that a district court should grant leave to amend even if no request to amend the pleading was made,

19   unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez*

20   *v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

21          While recognizing a case cited by the Defendants, *Ashcroft v. Iqball*, 556 U.S. 662, 678, 681

22   (2009) that conclusions are "not entitled to be assumed true" and that the complaint must contain

23   "sufficient factual matter, accepted as true, to state a claim to relief that plausible on its face . . ." the

24   FAC in this action is saturated with specific facts, explained in detailed and succinct fact-based

25   allegations.

26

27

28

---

### III.  MISCELLANEOUS CLAIMS BY DEFENDANTS
### WHICH MUST BE REJECTED BY THE COURT ON A
### MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

With respect to the first three causes of action regarding Defendants Lopes and Torres, Defendants claim that they calling the campus police was not retaliatory for Plaintiff exercising his free speech rights, but because they felt threatened by O'Brien (motion at p. 2 and p. 11).  That is for a jury to determine!  The question is not for the Court to decide on a 12(b)(6) motion to dismiss.  For example, in *Kyriacou v. Perolta Community College District*, 2000 U.S. Dist. Lexis 32464 [*] (D.C. N.D. 2009) the plaintiffs alleged in their complaint  that defendant's spoken words showed they were not content-neutral, but discriminatory; defendants claim the words were content-neutral.  The court stated: "While the court agrees that the Defendants may impose content-neutral restrictions on disruptive speech, at this stage in the litigation, the court must take Plaintiff's allegations as true [and thus] accordingly, the court must agree with plaintiffs that defendants have imposed a content-specific restriction of religious expression to which strict scrutiny applies." . . .  Thus, the court cannot grant Defendants' motion to dismiss on these grounds."  (*Kyriacou, supra* at *14-*15.

The first 28 paragraphs of the complaint specifically, and in detail, provide precise factual allegations regarding Plaintiff's speech, why those professors and administrators on the campus bristled at Plaintiff's speech, including his outspoken nature, and especially regarding his Chicano and Latino American Studies Department, creating his own web page speaking out against the new elected Student Body President, who, only after he was elected, claimed to be in the Country illegally, and then paragraph 28 describes the "poem" that was published in an insert in the daily Collegian, the student newspaper which O'Brien was required to fund, with said poem being entitled "America" but then starts of by stating "America the land robbed by the white savage, the land of the biggest genocide, etc." All of this occurred prior to the Torres/Lopes events of May 11, 2011.  Plaintiff also knew that Defendant Torres was a Department Chair of the Chicano and Latino Studies and the faculty advisor to said publication, that on May 11, 2011, he went to visit Defendant Torres to determine whether Torres had read the poem before he authorized its publication and what he thought about it.  (FAC ¶ 29) Plaintiff then states in detail that shortly after he arrived on the second floor of the Social Science Building where the CLS Department was located, he witnessed Defendant Torres speaking to Defendant Lopes wherein

1   Lopes stated that O'Brien was "stalking" the hallway, and then heard Torres state that the faculty should

2   post "wanted" signs with pictures of O'Brien's face on them to mock him and to serve as a warning to

3   other students and faculty as to what O'Brien looked like and warn of O'Brien's potential presence. (*Id.*

4   ¶ 29)  Paragraphs 29 A through D points out what occurred when he approached the open office doors

5   of Defendants Torres and Lopes and asked them a series of questions regarding the poem with his video

6   camera running.  Subparagraph C states that the reports by Defendants Torres and Lopes to the police

7   department and then to Defendant Coon were not only false reports, and were not based upon reasonable

8   fear or threat "but to stifle, and cause punishment to Plaintiff." (¶ 29 C)

9         However, in Defendants' motion at pages 2 and 11, they claim that their reports to the police

10   department were not "retaliatory," but because they felt threatened and intimidated.  This Court cannot

11   decide this issue on Defendants' motion to dismiss.  The complaint fully states as background facts, that

12   immediately before the confrontation with Lopes and Torres, and with O'Brien never having met them,

13   they were already talking about "wanted" posters of him in that very hallway.  At this juncture "the Court

14   must take Plaintiff's allegations as true" (*O.S.U. Student Alliance, supra*).

15         O'Brien's well-pleaded complaint stated that they reported it solely to retaliate and punish

16   Plaintiff for Plaintiff's political and social conservative views which were diametrically opposed by

17   faculty, and especially staff in the CLS Department.  Especially given free speech protections, and

18   especially those on a university campus, speech and expressive conduct cannot be banned, punished, or

19   retaliated against just because the professors, faculty and administrators find O'Brien's speech offensive,

20   unpleasant, or disagreeable.  *Texas v. Johnson, supra*, 491 U.S. 414.  It is for a jury to decide the

21   Defendants' motivation and whether or not a cry of "threat" was bogus.

22         The Defendants also cite California Penal Code § 632(a) for the proposition that "to videotape

23   persons without their consent violates California Penal Code § 632(a) [and] the prohibition extends to

24   videotaping by participants in the communication."  (Motion at 11) They conclude, therefore that

25   O'Brien's admitted conduct in videotaping the professors in their offices over their objections "was, in

26   itself, valid grounds for discipline" and  was "not retaliatory." (*Id.* p. 11) However, clearly § 632(a) is

27   only directed at communications which are underlined confidential, which as described in § 632(c) as "any

28   communication carried on in circumstances as may reasonably indicate that any party to the

1   communication desires it be confined to the parties thereto," and it also excludes any "communication

2   [which] may reasonably expect that the communication may be overheard or recorded."  As ¶¶ 29 and

3   29 A and B states that Lopes' and Torres' doors were open, O'Brien recorded them as he was speaking

4   to them, they knew the "communication" was not "confidential."

5        Thus, Defendants have made no cognizable claim which would permit the court to dismiss any

6   of the first three causes of action against Defendant Torres and Lopes.

7        **IV.  DEFENDANTS' CLAIMS THAT PLAINTIFF RECEIVED**
         **SUFFICIENT DUE PROCESS IN HIS DISCIPLINARY**
8        **PROCEEDING ARE WITHOUT MERIT**

9        Defendants start off their argument with respect to the disciplinary proceedings and the due

10   process claim (motion at 7) by citing *New Jersery v. T.L.O.*, 469 U.S. 325 (1985) and *Goss v. Lopez*, 419

11   U.S. 565. 579 (1975). The Defendants contend there the Supreme Court "concluded that students facing

12   suspension were entitled to 'some kind of notice and afforded some kind of hearing.' [Citing *Goss*]"

13   (Motion at 7)

14        Then, further quoting *Goss*, Defendants state that the Due Process Clause, in connection with

15   a short suspension do not require the opportunity to secure counsel, to confront and cross-examine

16   witnesses supporting the charge, or to call their own witnesses to verify their version of the incident,

17   because to do so might "well overwhelm the administrative facilities in many places and, by diverting

18   resources, cost more than it would save in educational effectiveness.  The court further held that if there

19   was a formalized suspension process "escalating its formality and adversary nature may not only make

20   it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching

21   process." *Goss* at 583.

22        Defendants then claim that since O'Brien admits that the wasn't being suspended, expelled or

23   prohibited for taking any classes, he received all of *"Goss' procedural protections."*  (Motion at 7)

24        Again, with respect to free speech and protection of free speech, especially on the college

25   campuses, the context in which a particular case was decided is crucial.  The *Goss* case was a

26   disciplinary action at a public high school in Columbus Ohio.  There, one high school student attacked

27   a police officer, another was among a group of students demonstrating in a school auditorium while a

28   class was being conducted, and when he refused to leave he physically attacked a police officer.  The

---

1   others were suspended for demonstrating in the school auditorium while a class was being conducted.

2   *Id.* at 569-570.  They were all suspended without a hearing in advance.  Again, it was a high school.

3          The *New Jersery v. T. L.O.* case was a Fourth Amendment challenge and involved a 14 year old

4   high school freshman smoking in the lavatory in violation of a school rule, her purse was then searched,

5   which yielded the pack the cigarettes, rolling papers and marijuana.  This utterly inapposite case

6   discussed the reasonableness of the search given the overall substantial interest of teachers and

7   administrators in "maintaining discipline in the classroom and on school grounds."  *Id.* 339

8          The *Goss v. Lopez* case, is more germane, but the setting in *Goss* was a high school with high

9   school students; the FAC setting alleged here is a public university, and O'Brien never assaulted anyone,

10  was never vulgar, never disrupted a classroom, and was doing nothing illegal.

11         The next case cited by the Defendants is *Gorman v. University of Rhoda Island*, 837 F.2d 7 (1st

12  Cir. 1988) and while it involved a university student and his due process right to hearing, that case is

13  decidedly inapposite for a number of reasons – not the least of which is that it did not involve the First

14  Amendment.  However, before getting to those reasons, the FAC, and the specific allegations contained

15  therein are necessary for the court to review.  The claims are specifically laid out in the sixth through

16  eighth causes of actions, incorporated all preceding paragraphs and then specifically focused on ¶¶ 29

17  and 29 A through T and then ¶ 30 that laid out specific facts directly pertinent to the due process and

18  equal protection claims in light of the underlying free speech violations which require the utmost

19  safeguards and protections.  The factual allegations are copiously detailed and thorough, as are the sixth

20  through the eighth causes of action.

21         Now getting back to the *Gorman v. University of Rhode Island* cited by the Defendants.  Gorman,

22  a student at the University of Rhode Island, was an active member of several student committees

23  involved in university administration, but in September of 1984 he was involved in "altercations with

24  two university employees" an argument with an acting director of the university student union over a

25  staff use of student van, and another argument about the van, with student senate secretary, both women

26  filed complaints charging Gorman with verbal abuse, harassment and threats.  Gorman was then notified

27  that separate hearings on these charges would be held pursuant to the provisions of the university

28  manual, they were heard before the university board on student conduct, the board consisted for each

1    hearing of one faculty member and five students, and the manual required that a staff member from the

2    Office of Student Life serve as an advisor to the university board on student conduct in all stages of the

3    university's judicial process.  The acting director of Student Life served as the advisor to the university

4    board, that person participated in its meetings as a non voting member, and the hearing lasted about 7

5    hours.  After the hearing, the board unanimously found Gorman guilty of harassing and intimidating the

6    acting director of the university student union and impeding her in the performance of her duty, and

7    Gorman was placed on disciplinary probation for six months and was required to attend one session at

8    the university's counseling center – which he did.  *Gorman*, 837 F.2d at 10.

9         At the hearing on the second incident the university board on student conduct consisted of three

10    new student members and two students who had been members on the prior board, including one student

11    who again served as chairperson, she was the chairperson in the previous board.  Gorman objected to

12    the presence of several members of the board on the grounds of bias.  Gorman's objections were denied,

13    he was found guilty, the board imposed sanctions consisting of a permanent ban from office of any

14    recognized student organization, a mandatory examination by the university consulting psychiatrist, and

15    if recommended, a commencement of a course of treatment.  *Id.* at 10.  Gorman appealed the latter

16    decision to the university appeal's board which consisted of two faculty members and one student.  The

17    appeals board based the review on the record of the hearing, the appeals board upheld the decision of

18    the university board on student conduct.  (*Id.* 10-11) Gorman then failed to comply with the sanctions

19    imposed by that board, so formal charges were filed by the vice president of the university notifying

20    Gorman that he was charged with three counts of violating a particular section of the student handbook

21    and hearing was scheduled.  Gorman then requested an open hearing, permission to have legal counsel

22    present, permission to tape record the proceedings, total media access to the proceedings, and a

23    stenographic record to be provided at the university's expense.  All those requests were denied.  The

24    board found Gorman guilty of not complying with the previous decision, imposed three sanctions against

25    him including immediate suspension from the university through the following academic year, with the

26    suspension to continue until he fully complied with all of the sanctions which had been imposed against

27    him, and then disciplinary probation throughout the remainder of his undergraduate enrollment.  Gorman

28    then filed suit.

1   In *Gorman*, the court held that at the bare minimum, the person adversely affected must be

2   afforded the opportunity to respond, explain and defend, and that whether the hearing was fair depends

3   upon the nature of the interest affected and all the circumstances of the particular case. *Gorman* at 13.

4   The *Gorman* court, cited *Goss v. Lopez, supra*, and *Mathews v. Eldridge*, 424 U.S. 319 in determining

5   the scope of the protection required:

6       "First, the private interests that will be affected by the official action;
        second, the risk of an erroneous deprivation of such interests through the
7       procedures used, and the probable value, if any, of additional and
        substitute procedural safeguards; and finally, the state interest including
8       the function involved and fiscal and administrative burden that the
        additional and substitute procedural requirements would entail." [Quoting
9       *Mathews v. Eldridge* at 335] *Gorman* at 13.

10  Citing *Goss*, the court held that *Gorman* was not entitled to "full scale adversarial proceedings

11  comparable to those afforded defendants in a criminal trial," as he claimed. *Id.* at 14.  The court held

12  that in a particular case the court must determine whether or not the individual had an opportunity to

13  answer, explain, and defend, and there must be a weighing or balancing of the competing interests

14  implicated in the particular case. *Id.* at 14.  The court stated that while fairness and disciplinary

15  procedure serves the goals of both students and schools, the burdens imposed on the school cannot be

16  so burdensome which would entail the expenditure of limited resources, and that it would be

17  substantially outweighed by the costs to providing that protection. *Id.* at 15. The process approved in

18  *Gorman* was that Gorman included a hearing before an entire board of faculty and students.  In sharp

19  contrast, Plaintiff's hearing here was before Mr. Freeman from the Health and Human Resources

20  Department who refused to acknowledged whether he knew about O'Brien, knew about his political

21  points of view or was familiar with the complaining witnesses. In *Gorman*, the court noted that Gorman

22  did not meet his burden of showing  that there was any bias or prejudice by any of the hearing officers

23  in that case. *Id.* at 15.

24  The court noted that Gorman had the opportunity to cross-examine his accusers as to the

25  incidents and events in question, there was no evidence of any limitation on Gorman's cross-

26  examination which prevented him eliciting the truth about the facts and events and the issue, and that

27  by making it more formal and escalating his formality and adversary nature not only make it more costly

28

1  as a regular disciplinary tool "but also destroy its effectiveness as part of the teaching process." Citation

2  to *Goss v. Lopez*. *Gorman* at 16.

3      As stated, there was no claim in *Gorman* that he was not allowed to put on the witnesses and

4  evidence that he desired.  Here, the claim is the opposite.  O'Brien was precluded from showing the

5  videotapes of the events at issue.  (¶ 29 Q)  That was the best evidence as to what had occurred at the

6  precise moment on that day.  O'Brien was precluded from examining the witnesses regarding any of the

7  events prior to the day in question, so he was precluded from showing the bias and motive of the

8  witnesses against him (¶ 29 Q), as was shown in all of the factual allegations leading up to paragraph

9  29 of the FAC.  Further, O'Brien was precluded from calling Detective Manuchairyan who not only

10 reviewed the videotapes, but he did not believe that Torres and Lopes was intimidated or threatened, or

11 that O'Brien did anything wrong, and then Manuchairyan went back to discuss them and tell them about

12 the videotape and what he observed on the tape and that they continued to be untruthful about the events

13 in question.  (¶¶ 29 G and Q)  So, the best evidence, the tapes was excluded, O'Brien's best witness,

14 Detective Manuchairyan, was excluded; Plaintiff was not afforded the opportunity to put on evidence

15 as to events leading up to May 11, 2011, the hearing officer allowed Defendant Gonzalez to testify even

16 though she never witnessed the events, the matter was only scheduled for a disciplinary hearing because

17 Defendant Coon set it for a disciplinary hearing because she refused to even watch the tape, but instead

18 stated that "well, something happened there."  (¶¶ 29 L and M)  It was also Defendant Coon who was

19 the one who was collecting complaints against the Plaintiff, and then refused to disclose that evidence

20 to the Plaintiff.  (¶¶ 23, 27 and 29 J)  The hearing officer refused to state whether he already knew about

21 Plaintiff, knew about Plaintiff's politics, or whether he had any type of relations with Defendants Torres

22 and Lopes.  (¶ 29 Q)  Dr. Welty's policy could have easily afforded an attorney to be present with

23 O'Brien, even if that policy had further stated that the attorney would not be allowed to examine

24 witnesses or make a statement, but the attorney could be present to counsel O'Brien regarding questions

25 to ask and in order to protect O'Brien's rights.  (¶¶ 29 K, L, M, and O)  The fact that Welty made the

26 decision that O'Brien could have one person with him (¶ 29 K), and then discriminated against

27 O'Brien's choice of that one person by precluding attorneys or anyone who had graduated from law

28

1   school all had a deleterious affect on O'Brien's undeniably crucial free speech rights in the university

2   setting.

3        *Gorman* was also entitled to appeal the board's decision to the university's appeals board which

4   consisted of two faculty members and one student, where he was allowed to argue the decision made

5   by the hearing board, and address the appeal panel.  O'Brien had no right to appeal Freeman's decision,

6   was precluded from even knowing about Freeman's opinion, and then Defendant Oliaro made the

7   ultimate decision without the benefit of O'Brien's complaints about the Freeman report.  (¶¶ 29 R and

8   S and 30)  Then Oliaro not only affirmed the findings of Freeman, he increased the punishments and

9   penalties, which Plaintiff alleges in factual detail in the FAC was done as pure punishment for O'Brien

10  exercising his free speech rights (¶¶ 29 R and S and 30), his rights to a hearing and expressing

11  conservative points of view amongst the left-leaning radical faculty and students of Fresno State.  While

12  the court in *Goss* found that formalizing the hearing process and escalating its "formality and adversary

13  nature" may make it more costly as a "regulatory disciplinary tool but also destroys its effectiveness as

14  part of the teaching process" [*Goss* at 583] the disciplinary proceeding provided to O'Brien, in this

15  university setting, where the exercise of free speech rights are at its zenith, the disciplinary hearing was

16  not a "teaching process."   It, instead was utilized to further punish O'Brien for his outspoken

17  conservative points of view, and retaliate against him for refusing to accept Defendant Coon's draconian

18  and arbitrary proposed disciplinary action wherein she did not even review the videotape which was the

19  best evidence of what had occurred.  On "appeal" to Oliaro, he increased the penalties to impose

20  "disciplinary probation" which was not imposed for any violation of the student conduct code nor the

21  regulations found in the administrative code, but, as stated in paragraphs 29 R, S, 30 and 31 F of the

22  FAC, "solely because Plaintiff was a staunch and outspoken constitutional conservative who objected

23  by words, actions, emails, his website, and in person to the events, actions and communications

24  described above and by proceeding through the Fresno State hearing process and that O'Brien was being

25  "singled out of retribution."  (¶ 30)

26        The sixth and seventh causes of action of the FAC set forth the due process, free speech, equal

27  protection and civil rights violations relating to the "hearing process."  While there is no precise case

28  on point which would encompass all of Plaintiff's alleged violations of his due process rights relating

1   to the hearing, since at least *Goss v. Lopez* was decided in 1975, clearly greater due process protection

2   must be afforded in a university setting when the exercise of free speech rights are at their zenith, it is

3   clear that the process that was due O'Brien was not borne out of some alleged violation of the code of

4   conduct, but as pure and unadulterated punishment, retribution and retaliation, as alleged in the FAC.

5   As the supreme court stated in *Goss* in a 1975 decision regarding a high school student disciplinary

6   hearing – not even in a university setting – the disciplinarian has to ensure that no injustice is being

7   done, that "one-sided determination of facts decisive of rights" does not promote fairness and that "no

8   better instrument has been devised for arriving at truth and to give a person in jeopardy of serious loss

9   notice of the case against him and opportunity to meet it." [Citations omitted.] *Goss* at 580.

10          The court in *Goss* also stated that the process due the students must be done so long as the cost

11   is not prohibitive nor where there is "interference with the educational process."  Based upon the facts

12   in the FAC providing more "due" process to O'Brien consistent with the process to meet the allegations

13   of Lopes and Torres – given what was at stake with respect to the violation of Plaintiff's free speech and

14   expressive rights[1] – the following would not make the cost to the university "prohibitive" nor any where

15   close to it, and would not interfere with the "educational process."  There is no "educational process"

16   in disciplining O'Brien for exercising his free speech rights, especially in light of the fact that he never

17   made physical contact with Lopes or Torres, never threatened them with violence and where the police

18   department conducted an investigation and determined that Plaintiff did not threaten or intimidate the

19   professors.   Moreover, the videotape showed that the professors were not being truthful, and that

20   Plaintiff was simply exercising his free speech rights on a university campus (see footnote 1 above).

21   Allowing at this "disciplinary hearing" O'Brien to: have an attorney in the room to counsel O'Brien

22   (even if the attorney could not cross-examine witnesses) to be allowed to record the hearing, to be able

23   to cross-examine the witnesses about the events leading up to day of the event in question, by being able

24   to call Detective Manuchairyan as a witness, by showing the videotape at the hearing, and cross-

25   examining the two complaining witnesses about that video, by having a hearing officer make assurances

26   that he does not know about the Plaintiff's political views so as to insure objective treatment, had not

27   _____

28          [1]The code of conduct section O'Brien was charged with, Title 5, California Code of Regulations § 41301(7) threats and intimidation.  At the end of said section, it expressly states that no disciplinary action against students can be taken based on behavior protected by the First Amendment.

1 read anything about the Plaintiff, except for the report of the incident, had no personal associations or

2 relationship with the two complaining witnesses and where Plaintiff was able to fully tell his side of the

3 story, including showing the videotape of the incident.   Providing such safeguards to O'Brien may have

4 taken an additional one hour of hearing time (as it was it was less than 2 hours; *Gorman* case accorded

5 that student 7 hours and had 5 "judges" and more appeal judges) any increased cost to the university

6 would have been *de minimus,* and providing such a procedure would have helped safeguard against

7 disciplinary action take solely to punish Plaintiff for exercising his free speech rights.   Additionally,

8 allowing Plaintiff to see the report and recommendation of Freeman and being able to address that report

9 prior to Defendant Oliaro issuing his decision (as *Gorman* was allowed to do) would not prolong the

10 process, increase the cost or "interfere with the educational process."  As stated: "Regarding the defense

11 of qualified immunity, government officials performing discretionary functions are shielded from

12 liability for civil damages insofar as their conduct does not violate clearly established statutory or

13 constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S.

14 800, 818 (1982) A right is clearly established when its conturs are sufficiently clear so that a reasonable

15 official would realize that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640

16 (1987).  Indeed, in *Hope v. Pelzer*, 536 U.S. 730 (2002), the supreme court rejected the "materially

17 similar" facts test to determine whether a right is clearly established.  That court, relying on its own 1997

18 case, stated that officials can be on notice "that their conduct violates established law even in novel

19 factual circumstances."  "Accordingly pursuant to *Lanier* [*United States v. Lanier*, 520 U.S. 259 (1997)]

20 the salient question that the court of appeals ought to have asked is whether the state of law at the time

21 of the challenged action gave respondents fair warning that their alleged treatment of Hope was

22 unconstitutional."  *Hope, supra*, at 741.  Given the nature of the alleged disciplinary action against

23 O'Brien in this case, and the fact that no disciplinary action could occur based on some alleged students

24 behavior protected by the First Amendment.  It should have been clear to any of the Defendants, Welty,

25 Oliaro and Coon that more process should have been provided, including the ability to examine the

26 witnesses with respect to events prior to May 11, 2011, showing the videotape, and having an attorney

27 present with O'Brien to counsel him as to which questions to ask in order to protect O'Brien's most

28 precious rights.  Thus, Plaintiff has factually plead claims for violation of due process with respect to

1    the disciplinary hearing, and as to one, more or all of the claims and/or sub-claims in the sixth through

2    eighth causes of action.

3                    **V.  DEFENDANTS' CLAIM THAT O'BRIEN'S FIRST**
                        **AMENDMENT RIGHTS WERE NOT VIOLATED BECAUSE**
4                    **THE DISCIPLINE WAS APPROPRIATE, IS WITHOUT MERIT**

5            Again, the court must accept the well-pleaded factual allegations of the complaint as true and

6    construe them in the light most favorable to the Plaintiff.  *O.S.U. Student Alliance v. Ray, supra*, 699

7    F.3d 1061.

8            The Defendants contend (pp. 9-10) that the discipline imposed upon Plaintiff was "appropriate"

9    citing four cases with respect to school discipline – not one of which involved the university setting

10   where, as stated before, the exercise of free speech rights by students is at its zenith.  So, the cases cited

11   by the Defendants are totally inapposite and really need no further discussion.  The one case cited by the

12   Defendants, *Bethel School District v. Fraser*, 478 U.S. 675, 681 (1986) (cited by Defendants at p.9) is

13   a great example as to why high school cases are an inappropriate barometer of what free speech rights

14   are protected in a university setting.  In *Bethel*, the respondent high school student delivered a speech

15   nominating a fellow student for student elected office at an assembly that was held during school hours

16   as part of a school-sponsored educational program in self-government that was attended by

17   approximately 600 students, many of whom were 14 year olds.  During the entire speech, the respondent

18   referred to his candidate in the terms of elaborate, graphic and explicit sexual metaphors.  Prior to giving

19   the speech, respondent discussed it with several teachers, two of him told him it was totally inappropriate

20   and should not be given.  He gave it anyway, and as the court stated: "The persuasive sexual innuendo

21   in Fraser's speech was plainly offensive to both teachers and students – indeed to any mature person.

22   By glorifying male sexuality, and its verbal content, the speech was acutely insulting to teenage girl

23   students.  The speech could well be seriously damaging to its less mature audience, many of whom were

24   only fourteen years old and on the threshold of awareness of human sexuality."  *Bethel* at 683.  The court

25   also stated that the penalties imposed against Fraser were unrelated to any political viewpoint.  *Id.* at

26   685.

27           There was nothing in O'Brien's contact with Lopes and Torres which was vulgar, lewd, or

28   profane.  He was never up close to them, but stood at their office doorway.  The questions asked were

---

1  to two adult faculty members, one of whom approved a poem in the student newspaper that called

2  Americans "white savages." None of the cases cited by the Defendants have any application here.

3      As equally fundamentally flawed is Defendants' assertion that because "O'Brien's conduct was

4  found to be threatening to faculty members on the floor, the sanctions were reasonable and served an

5  educational and practical purpose" and that the "sanctions that precluded him for loitering on the second

6  floor of the Social Sciences Building" could not "violate his rights to free speech and assembly."

7  (Motion at 10) "Loitering on the second floor of the Social Sciences Building" was not a claim that

8  O'Brien made in the FAC, nor anything close to it. O'Brien made detailed factual statements that the

9  sanctions precluded much expressive and association freedoms, precluded him from even being the

10  president of his own club, precluded him from serving on the Fresno State Student Body, and

11  discriminated against him in his interaction on the second floor of the Social Sciences of Building. The

12  fact that the hearing officer and Oliaro determined that O'Brien's conduct was "found to be threatening

13  to faculty members" is irrelevant to Plaintiff's claim that the allegations by Torres and Lopes, were not

14  motivated by fear or intimidation, but motivated because they despised Plaintiff's conservative point of

15  view and his outspoken disagreement with the radical left-leaning students and faculty members,

16  especially those in the CLS Department. It is for a jury to determine whether or not the sanctions

17  imposed against O'Brien were based upon valid non-speech related reasons, or as punishment for his

18  outspoken points of view. The FAC claims that it was the latter, not the former, and Defendants

19  disagreement with that has no application on a Rule 12(b)(6) motion to dismiss.

20      **VI. THE DEFENDANTS' CLAIM THAT THE DISCIPLINE**
   **WAS NOT RETALIATORY IS MERITLESS GIVEN**
21    **THE PROCEEDING BEFORE THE COURT**

22      At page 10 of the Defendants' motion, they claim the discipline was not retaliatory because

23  O'Brien's own allegations "show that he was disciplined for conduct threatening to others on campus,

24  and not for the content of his speech." That is completely false. O'Brien's complaints specifically and,

25  in detail, states that he was disciplined because of the content of his speech, the outspoken nature of his

26  speech, the fact that he is a constitutional conservative speaking out against the radical leftist faculty and

27  students in the CLS Department, and that the discipline was imposed upon him to silence and punish

28  him, and in order to retaliate against him, and that the "conduct threatening others on campus" was

---

1   simply a specious pretext for said discipline and retaliation.  Many facts were specifically alleged.

2   Defendants are not entitled to give their thoughts, their excuses, their reasons, nor their side of the story

3   in their motion to dismiss for a failure to state a claim.

4         Likewise, the Defendants' claim at page 11 that "an independent hearing officer, not the

5   Defendants, found that O'Brien violated six provisions of § 41301" is likewise totally irrelevant as

6   O'Brien's factual statement must be taken as true.  Further, Defendants claim (motion at p. 10) that

7   O'Brien caused a "disturbance in the Social Sciences Building by videotaping professors without their

8   permission, insistently questioning them and refusing to leave their offices" again, is simply the

9   Defendants' version of events, and irrelevant on a 12(b)(6) motion. Defendants citation to *Tinker v. Des*

10  *Moines Ind. Comm. School Dis't.*, 393 U.S. 503 (1969) is a mystery.  *Tinker* involved two public high

11  school students and one junior high school student who wore black arm bands to their schools to

12  publicize their objections to the Vietnam war.  The school's policy against it.  The majority opinion of

13  the court held that the wearing of arm bands could not be potentially disruptive conduct by those

14  participating in it, it was pure speech which entitled protection under the First Amendment, and the

15  school's regulation prohibiting the wearing of arm bands violated the students' free speech rights.

16        The other case cited by the Defendants, *Corales v. Bennett [and the Ontario-Montclair School*

17  *District]*, 567 F.3d 554 (9th Cir. 2009) is equally inapposite.  That case involved a few middle school

18  students who walked off campus without permission in order to participate in protests in their

19  neighborhood against then-pending immigration reform measures.  Again, this is a middle school.  The

20  Ninth Circuit found that they raised no cognizable claim, because they were punished for truancy,

21  leaving the school without permission, which had nothing to do with whether or not they wanted to

22  protest.  *Id.* at 566.  Plaintiff's FAC clearly and specifically stated that Plaintiff's protected activity of

23  asking the professor about whether or not they approved the poem in the student newspaper (which

24  O'Brien was required to fund) and whether or not they agreed with it.  University campuses are required

25  to be open for debate and inquisition.  Retaliation can be alleged and proved by showing here that the

26  "Defendants' actions would chill a person of ordinary firmness from continuing to engage in the

27  protected activity and that the protected activity was a substantial or motivating factor in the Defendants'

28  conduct."  *Corales* at 563.  This is exactly what O'Brien alleged in the FAC; that the discipline imposed

---

1    against O'Brien was imposed for the purpose of punishing O'Brien and retaliating against him for

2    exercising his free speech rights, and to chill his future speech, and was a substantial or motivating factor

3    in the Defendants' conduct in the discipline, the reporting to the police department alleging the threats

4    and intimidation simply masqueraded for the true motive which was to punish O'Brien and to chill

5    O'Brien from continuing to engage in protective activity.

6    

**VII.  DEFENDANTS' CLAIM THAT O'BRIEN'S DECEMBER 1
AND 2, 2011 ENCOUNTERS WITH FACULTY DID NOT VIOLATE
HIS CONSTITUTIONAL RIGHTS, IS WITHOUT MERIT**

8            Defendants' argument (motion at pp. 11-12) suffers from the same fatal flaw as other portions

9    of their motion by attempting to claim that the Defendants were justified in their actions regarding the

10   December 1 and 2 incidents, that they had a right to question Plaintiff's presences on the floor of the

11   building and that the administrators had a "compelling interest in ensuring the faculty safety and to

12   prevent disturbances inside an academic building during the school day."  Said argument by the

13   Defendants is outside the scope of a § 12(b)(6) motion.  The factual allegations regarding this in the FAC

14   are set forth in detail (and were videotaped) in ¶¶ 31 and 31 A through G. Once the Defendants are

15   required to file an answer to the FAC, they will have their time to respond to the allegations of the FAC.

16   Their defense of the facts alleged in the FAC is not the appropriate subject of this motion, nor is their

17   alleged reasons for reacting for the way they did.  The FAC clearly points out exactly what O'Brien did

18   and how these Defendants reacted, Jendian and Gonzalez, in retaliating against Plaintiff based upon his

19   political views and for punishment and retaliation purposes.  The specific facts stated in ¶ 31 and its

20   subparts, clearly showed that Plaintiff's conduct was protected by his free speech and association rights,

21   and that those two Defendants retaliated against for exercising those rights.  The Defendants' claim

22   (motion at p. 11) that O'Brien went "without warning to the second floor of the Social Sciences Building

23   while he was on probation," and that somehow this justified the Defendants' conduct is irrelevant to the

24   motion.  The sanction imposed by Oliaro and the terms of his probation did not require Plaintiff to

25   provide advance warning; and Defendants jumping the gun simply because it was Neil O'Brien, with

26   their contempt for his political points of view cannot be negated in the Defendants' motion to dismiss,

27   because it will be up to the jury to determine whether or not the Defendants had a retaliatory purpose

28   or were justified.  Plaintiff's claim that he asked the officers to wait for his attorney (Defendants' motion

1    at p. 12, citing ¶ 31 (C) of the FAC) has nothing to do with whether or not the Defendants caused the

2    original illegal detention by the campus police and whether or not the Defendants were justified in their

3    conduct towards the Plaintiff.

**VIII.  THE DEFENDANTS' CLAIM THAT DEFENDANT
OLIARO'S NEW SANCTIONS ORDER DID NOT
VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHT IS
MERITLESS ON DEFENDANTS' MOTION TO DISMISS
PURSUANT TO RULE 12(b)(6)**

7         Defendants contend (motion at p. 12) that Oliaro's additional order following the December 1

8    and 2, 2011 incident requiring him to provide 24 hour advance notice to the Dean of that department,

9    (which happened to be Defendant Gonzalez), as to when Plaintiff would be on the second floor of the

10   social sciences building was not a constitutional violation because this "clarification was minor and

11   practical."  (Motion at p. 12) Paragraphs 31 F through 32 specifically allege that Oliaro's additional

12   order of probation was motivated to punish Plaintiff for exercising his constitutional rights to free speech

13   and association.  Paragraph 31 F stated that Oliaro specifically stated that he determined that Plaintiff

14   had not violated his probationary status because he was rightfully on the second floor to complete a class

15   assignment, but instead of punishing Gonzalez and Jendian for their conduct for those dates, he further

16   required the 24 hour notice to the very Defendant, Defendant Luz Gonzalez, that he had already been

17   retaliating against Plaintiff and his points of view.  Thus, after finding that Plaintiff did nothing wrong,

18   Oliaro, without a hearing, increased the sanctions against Plaintiff.  The lone case cited by the

19   Defendants, *Tigrett v. Rector & Visitors of Univ. Virginia*, 293 F.3d 620, 625 (4th Cir. 2002) for the

20   proposition that the court rejected the student's argument there that they had a right appear again before

21   the ultimate decision maker, the university president, who had imposed more severe sanctions than a

22   disciplinary panel had recommended.  That case is, for many reasons, inapposite.  The actual hearing

23   provided to Tigrett included far more safeguards than the hearing provided to O'Brien: the defendants

24   had their own attorneys, they were afforded a 13 hour trial in which they fully participated, the ultimate

25   fact finder was part of that singular process.  Further, the case had nothing to do with free speech rights;

26   the expelled student violently assaulted another student etc.

27

28

## IX.  DEFENDANTS' CLAIM THAT ALLEGED HARM TO REPUTATION IS NOT A BASIS FOR A 1983 CLAIM IS A NON SEQUITUR AND IS MERITLESS

Defendants contend (motion at p. 13) that Plaintiff's alleged harm to reputation is not a basis for a 1983 claim is simply a red herring *strawman* argument, as Plaintiff filed no separate claim under § 1983 for alleged harm to his reputation.  Defendants cite ¶ 38 of the FAC.  Paragraph 38 is simply Plaintiff's allegations regarding the general and compensatory damages suffered by Plaintiff as a result of the violations of the § 1983 claims, none of which alleged a separate claim for harm to reputation.

## X.  DEFENDANTS' CLAIM THAT O'BRIEN'S CONSTITUTIONAL RIGHTS WERE NOT VIOLATED WHEN HE WAS BARRED FROM APPLYING FOR STUDENT GOVERNMENT POSITIONS AND LEADING A CLUB, IS WITHOUT MERIT

Defendants contend that the extra curricular activities of applying for student government positions and from serving as president or treasurer of a club he founded are not protected by any constitutional right, citing two different cases, none of which have any relevance to Plaintiff's claim in this case.  Plaintiff's claim that Oliaro increased the penalty recommended by Coon and Freeman when he imposed as part of the sanction "disciplinary probation," which precluded Plaintiff from serving as the president or treasurer of the club that he formed on campus, and prevented him from running for or serving on the Fresno State Student Body (¶ 29 T), and this was in retaliation because Plaintiff's exercise of free speech rights, as just an additional form of punishment against Plaintiff. (¶¶ 29 T and U and 30, 34, and 37.)  Contrary to the Defendants' ill-informed argument, Plaintiff is not claiming a property interest in participation in student council.  Instead, O'Brien claims that it was an extra penalty imposed by Defendant Oliaro because of Plaintiff's exercise of his free speech rights, and as further punishment, because Oliaro knew that Plaintiff was heavily involved in student activities, attended Student Body meetings, and was an outspoken participant of said meetings.  The case cited by the Defendants, *Bull v. Dardanelle Public School District*, 745 F.Supp. 1455, 1461 (E.D. ARK. 1990) (motion at p. 13) involved a <u>high school student</u> who did not qualify to run for student office.  The lack of qualification had nothing to do with any <u>prior</u> alleged violation of free speech rights.  The court held that "plaintiff does not have a constitutional right to run for high school student council," and the actions of the teachers in not approving "plaintiff's candidacy were related to 'legitimate pedagogical concerns.'

1  [Citations omitted.]" *Bull* at 1460.  Here, Plaintiff alleges that Oliaro's extra disciplinary action of

2  placing Plaintiff on disciplinary probation was retaliatory punishment for Plaintiff's free speech exercise

3  of rights on a university campus, and was for punishment for the exercise of those rights not for

4  "pedagogical concerns."

**XI.  SINCE PLAINTIFF MADE NO SEPARATE CONSTITUTIONAL
CLAIM REGARDING O'BRIEN'S PUBLIC RECORD ACTS
REQUEST, DEFENDANTS' *STRAWMAN* ARGUMENT TO
THE CONTRARY IS MERITLESS**

8         At page 15, Defendants contend that Plaintiff's FAC claim that Fresno State violated his public

9  records act request not lead to liability under § 1983, because it is a state law claim.  Plaintiff <u>did not file</u>

10 <u>any separate claim under § 1983</u> for a violation of his public records act requests; Plaintiff alleged the

11 Defendants were further discriminating and retaliating against him for the free exercise of his free speech

12 rights by refusing to provide the records requested.

**XII.  CONTRARY TO THE DEFENDANTS' CLAIM, PLAINTIFF
DID NOT ALLEGE A SEPARATE CAUSE OF ACTION OF
"SELECTIVE ENFORCEMENT"**

15        Citing ¶ 36 of the FAC, Defendants contend that Plaintiff failed to show selective enforcement

16 by claiming that persons similar situated were not treated alike.  (Motion at p. 15) However, ¶ 36 alleged

17 that Plaintiff was denied equal protection because the Defendants retaliated and punished Plaintiff for

18 his outspoken constitutionally conservative and libertarian political and social philosophy, whereas

19 radical left-leaning groups who were embraced by the Defendants and were not punished for their own

20 egregious conduct and instead were glorified by the Defendants for their courage and defiant behavior.

21        Paragraph 36 of the FAC states that Defendants refused to take any action whatsoever against

22 leftist radical groups described in ¶ 36 who illegally occupied Defendant Oliaro's office, were disorderly,

23 caused a substantial obstruction, were acting threateningly, where hostile, rude, became trespassers,

24 interrupted business, video recorded after being asked not to do so, and refused to comply with campus

25 police orders, and refused to leave the office after closing hours.  Said paragraph states that all those

26 trespassers were all glorified by the Defendants for their "courage and defiant behavior during this

27 occupation."  Again, Defendants' claim (motion at p. 15) of what might be the Defendants' response

28 when they are required to answer the FAC is irrelevant: "a group protest over rising tuition costs is not

1  similar to complaints that a student's conduct threatened other persons on campus." That is simply not

2  the claim in the complaint.  Plaintiff's claim was that he was retaliated against and punished for

3  exercising his conservative view points on the campus, and that the alleged threats to others on campus

4  was simply contrived in order to punish Plaintiff for his exercise of his free speech rights, whereas much

5  more egregious violations of the conduct code by leftists were applauded.

6  ### XIII.  NONE OF THE DEFENDANTS HAVE QUALIFIED IMMUNITY

7       Defendants contend that they all have qualified immunity against all of the claims by Plaintiff

8  based upon the erroneous premise that none of Plaintiff's free speech rights were even violated by any

9  of the Defendants.  Since the Defendants' premise is false, the Defendants cannot add or spin their

10  version of the events.  They must live with the well-pleaded factual allegations in the complaint, as

11  discussed numerous times above.  As stated several times above, a student's exercise of free speech

12  rights are immensely protected on a university campus.  Plaintiff's well-pleaded FAC reveals in express

13  detail that the actions taken against Plaintiff were in retaliation and punishment for Plaintiff's outspoken

14  conservative stance on many campus activities, especially with the CLS Department for which the

15  Defendants intended to punish Plaintiff, and that the alleged "threats and intimidation" that lead to the

16  disciplinary hearing, the probation, the disciplinary probation and all of the other retaliation was simply

17  a pretext to punish Plaintiff for the exercise of those free speech rights.  Those rights guaranteed on a

18  university campus have been clear for decades before the Defendants' conduct ever occurred. They were

19  clearly known or should have been known by the Defendants.  Indeed the alleged code of conduct

20  violation alleged by the Defendants had a specific provision that no discipline can be taken against a

21  student that would otherwise violate his rights protected under the First Amendment.  (See footnote 1,

22  *supra*)  The academic policy manual, and Article IX of the California Constitution further solidifies the

23  free speech rights of students, and the well-pleaded FAC specifically alleged said violations.  Plaintiff's

24  rights were clearly established "in light of the specific context of the case." *Krainski v. Nevada ex rel.*

25  *Board of Regents*, 616 F.3d 963, 968 (9th Cir. 2010) (cited in Defendants' motion at p. 16) That case,

26  however, is inapposite as the student there alleged a procedural due process and a fourth amendment

27  unlawful arrest and imprisonment claim, but the court found that the officers had probable cause to arrest

28  her. But that, even if the officers were mistaken that probable cause to arrest existed, they were immune

1    from liability if their mistake was reasonable. *Id.* 969. Based upon the well pleaded facts in Plaintiff's

2    FAC, Defendants knew, or should have known, they were violating Plaintiff's free speech and

3    association rights by retaliating against Plaintiff for exercising those rights, and utilizing a pretext of

4    "threats and intimidation" which Defendants knew or should have known were absolutely not true. The

5    Defendants' claim that O'Brien's conduct "clearly impinged on the rights of others" are their defenses.

6    The hearing officer's "determination" – after the fact – that found O'Brien's conduct to be threatening

7    (motion at p. 18) is totally irrelevant based upon the well pleaded facts in the FAC.

### XIV.  O'BRIEN SUFFICIENTLY PLEAD A CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS

10   Defendants' sole contention regarding their claim that O'Brien cannot plead a conspiracy because

11   "the alleged conduct did not violate Plaintiff's civil rights and there was no unlawful purpose" to his

12   discipline (motion at p. 18) is again, Defendants disputing – and putting their spin on – the well pleaded

13   facts in Plaintiff's FAC. All of the facts leading up to ¶ 41, and then ¶ 42 through the conclusion of the

14   first cause of action at ¶ 53 fully supports Plaintiff's FAC for a conspiracy amongst the Defendants to

15   violate Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983 and 1985.

### XV.  CONTRARY TO DEFENDANTS TORRES' AND LOPES' CLAIM THAT THEY DID NOT ACT UNDER COLOR OF STATE LAW, THE FACTS IN THE COMPLAINT ALLEGE OTHERWISE

18   Defendants Torres and Lopes claim (motion at pp. 20-21) that their reporting to the campus

19   police department and then testifying at the disciplinary hearing were not acting under color of state law

20   at that time because they were acting simply as private citizens reporting to the police, as "any person

21   on campus would have called police in response to such harassment." (Motion at p. 21) Again,

22   Defendants attempt to spin the facts, distort the allegations in the FAC as though they were pleading

23   some type of defense to a complaint, as opposed to moving to dismiss those causes of action, is

24   inappropriate. The FAC clearly points out that Torres and Lopes were not under any reasonable fear of

25   intimidation or threats, but were retaliating against and punishing Plaintiff for his outspoken political

26   points of view regarding the leftist agenda of the CLS faculty members and the administrators. Thus,

27   as alleged in the FAC, they were not acting as a "private citizen reporting to the police the details of an

28

---

1   alleged criminal act" (motion at p. 20).  Defendants Torres and Lopes whole claim that they were not

2   acting under color of state law are refuted by the well pleaded facts of the FAC.

3   ### XVI.  DEFENDANTS WELTY AND OLIARO ARE LIABLE FOR
    ### THE SUBORDINATES ACTIONS, AS SPECIFICALLY SHOWN
4   ### IN THE ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

5       Paragraph 45 of the FAC states in detail why Defendants Welty and Oliaro are named in each

6   and every cause of action, and for the reasons stated therein.  Those allegations will not be repeated

7   herein.  As Defendants recite at page 19 of their motion, supervisory officials are liable for actions of

8   subordinates under § 1983 if they were personally involved in the constitutional deprivation, or there

9   is a sufficient causal connection between the supervisor's wrongful conduct in the constitutional

10  violation, or if the supervisor participated in or directed the violations, knew of the violations of

11  subordinates and failed to act or prevent them, or their own inaction in the training, supervision or

12  control of his subordinate, or his acquiescence in the constitutional deprivations.  (Motion p. 19) Citing

13  *Hansen v. Black*, 885 F.2d 642, 645-646 (9th Cir. 1989) and *Corales, supra*, 567 F.3d 570.  See ¶ 35 of

14  the FAC as well as ¶¶ 19, 20, and especially ¶ 21 where it is alleged that Defendants Welty and Oliaro

15  "either participated directly in the conduct alleged below, and/or they acquiesced in it, approved it, had

16  the ability to stop and prevent it, and the authority to correct it, and knowingly and intentionally did not.

17  The disciplinary rules and procedures were crafted and implemented by Defendant Welty and overseen

18  by Defendant Oliaro."  That satisfies the pleading requirement with specific facts.

19      Defendants' claim that O'Brien's conclusions about Dr. Welty "are not entitled to be assumed

20  true," citing *Ashcroft, supra*, 556 U.S. 681.  (Motion p. 19) However, O'Brien stated much more than

21  just "conclusions" about Defendant Welty.  The specific allegations regarding Defendant Welty are

22  stated throughout the FAC.  Further, the *Ashcroft* case was dissected and explained by the Ninth Circuit

23  in *O.S.U. Student Alliance v. Ray, supra*, 699 F.3d 1053 (2012).  *O.S.U.* was a case involving free

24  speech and a claim under § 1983.  Where *Ashcroft* dealt with racial and religious discriminations

25  perpetrated by subordinates of then Attorney General Ashcroft.  *Ashcroft* emphasized that with a

26  constitutional tort, the plaintiff must allege that every government defendant – supervisor or subordinate

27  – acted with the state of mind required by the underlying constitutional provision. *O.S.U., supra* at 1970.

28  Thus, when the plaintiff in *Ashcroft* alleged insidious discrimination claims against the attorney general,

1    the plaintiff had to allege that the attorney general acted with the purpose of discrimination by race,

2    religion or national origin. (*Id.* at 1070) But the *O.S.U.* court stated that in its free speech § 1983 action:

3         "The First and Fourteenth Amendment free speech claims against [the
           supervisor] however, do not implicate this requirement, because the
4         allegations show specific intent. *Id.* at 1070.

5         Then the court discussed the plaintiff's claim against the president and vice president at OSU,

6    and the charges against them were that they knew about the underlying free speech violations and

7    acquiesced in it.  *Id.* at 1071.  The court noted that a § 1983 claim contains no state-of-mind requirement

8    "independent of that necessary to state a violation of the underlying constitutional right; therefore, the

9    requisite mental state for individual liability will change with the constitutional provision at issue."

10   [Citation omitted.] *Id.* at 1071-1072.  The Ninth Circuit then dealt with the fact that the president and

11   vice president were alleged to have knowingly acquiesced in their subordinates' violations of the

12   plaintiff's free speech rights, and the court had to determine whether or not that was the enough.  (*Id.*

13   at 1072) The court concluded that knowledge and acquiescence in the subordinates' conduct was

14   sufficient for the president and vice president liability at the OSU campus.  *Id.* at 1073-1074 Especially

15   because with respect to free speech, the government need not target the speech in order to violate the free

16   speech clause.  *Id.* at 1073.

17        In conclusion, the court stated that because free speech violations do not require specific intent

18   "we conclude that allegations of facts that demonstrate an immediate supervisor knew about the

19   subordinate violating another's federal constitutional right to free speech, and acquiescence in that

20   violation, suffice to state free speech violations under the First and Fourteenth Amendments." *Id.* at

21   1075.

22        The specific allegations in the complaint respecting Oliaro's and Welty's knowledge of and

23   acquiescence in the subordinates' violations of O'Brien's free speech rights suffice.  Indeed, the FAC

24   specifically alleges more than just knowledge and acquiescence, as it alleged Oliaro and Welty were

25   directly involved in the free speech violations, and it was them that developed and instructed the culture

26   at Fresno State to favor and applaud the left-leaning radical students and faculty and to silence those

27   outspoken contrarian, like O'Brien.  Thus, every cause of action in the FAC states a valid claim against

28   Welty and Oliaro.

## XVII.  O'BRIEN'S CLAIM FOR PRIVATE ATTORNEY GENERAL ATTORNEY'S FEES AND COSTS DOES STATE A CLAIM FOR ATTORNEY'S FEES

Defendants contend (motion at p. 21) that private attorney general attorney's fees under California Code of Civil Procedure § 1021.5 are state rules, and a § 1983 claim may not be based on state law.  According to Congress, § 1983 claims can be brought in the state court.  The state procedural rules allow, upon proof, that the prevailing party is entitled to attorney's fees if three elements are satisfied.  Now is not the time to prove the three elements, and while federal civil rights law does allow for attorney's fees and costs, there is nothing that excludes an award of attorney's fees under § 1021.5.

## XVIII.  IF THE COURT DISMISSES ANY CLAIM, LEAVE TO AMEND SHOULD BE GRANTED

Despite the overwhelmingly general rule to allow amendment, Defendants contend (motion at p. 22) that the court should deny leave to amend where the amendment would be futile.  There would be nothing futile about amending the FAC or any cause of action therein, because the Defendants could not persuasively show that no set of facts alleged would allow Plaintiff to pursue the claim.

## XIX.  CONCLUSION

Based on the foregoing points, authorities, and argument, and the First Amended Complaint at issue, Defendants' motion to dismiss any of the claims must be denied.

DATED: February19, 2013

                                    /S/ BRIAN C. LEIGHTON
                                    BRIAN C. LEIGHTON, legal counsel
                                    for Plaintiff NEIL O'BRIEN

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2013, I electronically filed the following document(s) with the Clerk of the Court by using CM/ECF system:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on February 19, 2013, at Clovis, California.

        /S/ Kimberly R. Barker
        Kimberly R. Barker, declarant