IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NEIL O'BRIEN, | ) | 1:12-CV-2017 AWI SAB |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | AND ORDER ON |
| | ) | DEFENDANTS' MOTION TO |
| DR. JOHN D. WELTY, DR. PAUL M. | ) | DISMISS PLAINTIFF'S FIRST |
| OLIARO, DR. CAROLYN V. COON, | ) | AMENDED COMPLAINT |
| DR. VICTOR TORRES, DR. MARIA A. | ) | |
| LOPEZ, DR. LUZ GONZALEZ, DR. | ) | |
| MATTHEW JENDIAN; each in their | ) | Doc. # 18 |
| personal capacities, and DOES 1 through | ) | |
| 25, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

        This is an action for damages, injunctive and declaratory relief by plaintiff Neil

O'Brien ("Plaintiff") against a number of faculty and administrators of California State

University Fresno ("University") (collectively, "Defendants").  Currently before the court is

Defendants' motion to dismiss Plaintiff's First Amended Complaint ("FAC") pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  All of the claims alleged in Plaintiff's

FAC are brought pursuant to 42 U.S.C. § 1983 or 1985 and allege violations of the First and

Fourteenth Amendments of the United States Constitution.  Federal subject matter

jurisdiction exists pursuant to 28 U.S.C. § 1331.  Venue is proper in this court.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff's FAC alleges a total of eleven causes of action. Although somewhat difficult to follow at times, Plaintiff's claims relate to a sequence of events that commenced on May 11, 2011, when Plaintiff sought to speak to Defendants Lopes and Torres concerning the publication of a poem called "America" (hereinafter, the "Poem") in a student publication called "La Vox de Aztlan," which is a supplement to the official school newspaper called "The Collegian." Plaintiff, a self-described outspoken constitutional conservative, found the Poem extremely upsetting and insulting and sought initially to ascertain the view of Defendant Torres, a faculty member. Plaintiff alleges that as he was approaching the faculty office area of members of the "Chicano and Latino- American Studies Department" ("CLS"), he overheard Defendant Lopes comment to Defendant Torres that Plaintiff was "stalking" the hallway and that the "faculty should post 'wanted' signs with pictures of Plaintiff's face on them to mock Plaintiff and to serve as a warning to other students and faculty as to show Plaintiff looked like and warn of Plaintiff's presence." Doc. # 14 at 17:17-19. Upon hearing this, Plaintiff determined to approach both Torres and Lopes on the subject of the Poem.

The first part of Plaintiff's exposition of background facts in the FAC details at length Plaintiff's contentious relationship with what Plaintiff feels are the left-leaning, progressive and/or radical elements that dominate the Social Sciences Department in general and the CLS department in particular. Plaintiff's opposition to the then student body president, a person believed by Plaintiff to be an illegal alien, as well as his opposition to points of view expressing support for the DREAM act and similar sentiments of the Chicano student community resulted in numerous complaints against Plaintiff which Plaintiff felt "distorted and misrepresented events" prompting Plaintiff to video-record his campus activities. See Doc. # 14, pp. 6-15. Thus, when Plaintiff approached the offices of Defendants Lopes and Torres on May 11, 2011, he did so with his video camera recording. Plaintiff does not state that he secured the permission of either Defendant before attempting to interview and video-

tape them.  Plaintiff alleges that he first approached Torres in Torres' office and asked whether he had approved the Poem.  Torres refused to answer, but Plaintiff insisted on speaking to Torres about the Poem.  Torres then called campus police.  Plaintiff alleges he then went to ask the same questions concerning the Poem of Defendant Lopes, again with video camera on and again with much the same result; Lopes refused to speak to Plaintiff and called campus police when Plaintiff insisted that she respond to his questioning.  Plaintiff alleges that Defendants (Department Dean) Gonzales, Torres and Lopes filed complaints with the Campus Police Department and that the complaints falsely portrayed Plaintiff's conduct as threatening or intimidating.  Plaintiff alleges that recordings from his video camera demonstrate the falsity of the complaints.  Plaintiff alleges that the motive for the filing of the complaints was retaliation for Plaintiff's previously-expressed political views.

The remainder of the extensive factual background set forth in Plaintiff's FAC pertains to events that transpired as a result of the filing of complaints by Torres, Lopes and Gonzales.  The FAC alleges that, on May 24, 2011, Defendants Torres, Lopes and Gonzales "filed similar false reports with Defendant Coon," who was then acting in a number of administrative capacities including Dean of Students and Student Conduct Administrator.  Doc. # 24 at 18:16-19.  It is not clear from the FAC whether Coon would have received the complaints in due course or whether Coon's receipt of the complaints was out of the ordinary.  At the same time, Plaintiff posted the video recordings of his encounters with Torres and Lopes online and provided a copy of the video to the campus police.  Plaintiff alleges the police initially declined to take action against Plaintiff based on Plaintiff's proffer of evidence that he had not threatened or intimidated Lopes or Torres, but the complaining parties requested that the complaint be amended to include their allegation of intimidation in order to "silence, retaliate and cause Plaintiff to be disciplined."  Doc. # 4 at 19:7.

Defendant Coon notified Plaintiff by letter of the allegations contained in the complaints and informed Plaintiff that he was to schedule and attend a "judicial conference"

3

not later than June 3, 2011.  Plaintiff denied the allegations in the complaints by e-mail and requested that Coon provide to him with "copies of the reports made by all students, staff, and administrators about Plaintiff."  Doc. 14 at 19:25-20:1.  Although the FAC is not explicit on the point, the court infers that what Plaintiff requested was all reports by anyone pertaining to any conduct by Plaintiff, not just to the conduct alleged in the filed complaints. Plaintiff stated by e-mail his intention to attend a judicial conference and requested that he be allowed to be accompanied by counsel and that he be allowed to video record the proceedings.

On June 2, 2011, Defendant Oliaro, Dean of Students and Vice President of Student Affairs, responded to Plaintiff's e-mail.  Oliaro informed Plaintiff that representation by counsel is not allowed during the informal judicial conference, although a non-attorney advisor could attend.  Oliaro also informed Plaintiff the he would be provided with records pertaining to the complaints by Torres and Lopes.  Plaintiff was also informed that, in the event he disagreed with conclusions reached or sanctions imposed as a result of the judicial conference, Plaintiff could request a formal hearing.

The judicial conference was held on June 17, 2011.  The conference was conducted by Defendant Coon.  Plaintiff alleges that the proceeding was conducted without review of Plaintiff's video recording of the events and out of the presence of Plaintiff's attorney, who had accompanied Plaintiff to the conference.  Plaintiff vehemently denied the allegations contained in the complaints.  At the conclusion of the proceeding, Coon concluded that sanctions were appropriate and proposed a "settlement agreement" in which the sanctions were spelled out.  Essentially, the sanctions consisted of stay-away orders to prevent Plaintiff from approaching within 100 feet of any of the CLS faculty or staff, their offices or classrooms.  Plaintiff refused to agree to the proposed settlement and a formal  "judicial hearing" was set for August 18, 2011, and later rescheduled for September 13, 2011.  On August 26, 2011, Plaintiff received an e-mail and letter from Defendant Coon explaining the

4

charge against him and advising Plaintiff as to the rules of the upcoming hearing.  Again, Plaintiff was informed that his attorney would not be allowed to assist Plaintiff during the hearing and that the only persons allowed to be in attendance would be "'the person conducting the hearing, [Plaintiff], the Student Conduct Administrator, a single [non-attorney advisor for Plaintiff], a single advisor for the Student Conduct Administrator, the person designated to record the hearing, and witnesses while they are testifying.'"  Doc. # 14 at 23:21-24.

The formal judicial hearing was held on September 13, 2011, with Mr. Marcus Freeman, a staff member of Arts and Humanities Department, acting as hearing officer.  As instructed, Plaintiff was not allowed the assistance of counsel during the hearing and the substance of the hearing was confined to the events of May 11, 2011.  Any questions regarding Defendants' antipathy to Plaintiff's political views were not allowed.  Plaintiff was not allowed to question Freeman as to any potential conflicts of interest or with any familiarity Freeman may have had with Plaintiff's opinions, postings or political activities. Pages 24 through 27 of the FAC set forth Plaintiff's objections to the form and substance of the formal judicial proceeding.  In essence, Plaintiff contends that the denial of assistance of counsel, limitations on the scope of cross-examination of witnesses, the refusal of the hearing officers to review the video recordings or admit them into evidence, and the refusal of the hearing officer to permit testimony by Plaintiff's witness, Detective Manucharyan, constituted violation of Plaintiff's rights of procedural due process.

The product of the formal judicial hearing was a report and recommendations produced by Freeman and provided to Defendant Oliaro, whom Plaintiff terms "Defendant Welty's 'designee.'"  Doc. # 14 at 27: 24-25.  Freeman's report (the "Report") was reviewed by Oliaro and a decision was issued by Oliaro based on the Report (the "Decision") on September 30, 2011.  Plaintiff alleges he was not allowed to review the Report or to challenge its contents prior to the issuance of the Decision.  Plaintiff alleges he later reviewed

the Report and contends it "was replete with inaccuracies and blatant manipulation of the 'evidence' and stated that his [sic] review showed Plaintiff violated five other provisions of § 41301 [of Title 5 of the California Code of Regulations], in addition to subsection [b]7." Doc. # 14 at 28:7-9.  Plaintiff alleges that Defendant Oliaro sustained the Report finding that "Defendants Torres and Lopes reasonably could find Plaintiff's behavior [on May 11, 2011,] to be 'intimidating and harassing and were concerned for their safety.'" Doc. # 14 at 28:15-16.

The FAC alleges that the Decision not only imposed the sanctions previously recommended by Defendant Coon at the conclusion of the informal hearing – basically stay-away orders pertaining to CLS faculty, staff and offices – but imposed in addition the sanction of "disciplinary probation" through the spring semester of the following year; that is, until May 20, 2012.  Of significance to Plaintiff's FAC, the sanction of disciplinary probation prevents the person subjected to that sanction from holding office in the student government and from holding office in any college-approved club.  Plaintiff contends these prohibitions resulting from disciplinary probation constitute an unlawful restriction on Plaintiff's First Amendment rights inasmuch as Plaintiff was actively considering running for student government office and was to be an officer of the Fresno State chapter of Young Americans for Liberty, which Plaintiff had recently formed and that had been officially recognized by the College.  There is no indication in the FAC that the imposition of disciplinary probation prevented Plaintiff from attendance at the functions of either student government or campus clubs or that he was prohibited from speaking at either during times allotted for public speech.

The essential contention set forth in the FAC is that all of the proceedings up to and including the imposition of the sanctions under the Decision were motivated solely by Defendants' animus toward Plaintiff's staunch and outspoken constitutional conservatism and by Defendants' desire to punish Plaintiff for the content of his speech and to chill further

expression of his political views.

In the Fall of 2011, during the period of time that the sanction of disciplinary probation including the stay-away orders were in force, Plaintiff enrolled in a course in Recreational Administration.  As part of the class, students were required to assess a building on campus and any accompanying parking lot for compliance with the federal Americans with Disabilities Act ("ADA").  Although it is not clear from the FAC whether the choice of the building was with the student or the instructor, Plaintiff alleges that the class instructor "authorized" Plaintiff to complete the survey on the Social Sciences Building, which houses the CLS Department offices and classrooms.  It is also not clear whether the instructor was apprised of the stay-away orders.  On December 1, 2011, Plaintiff equipped himself with written ADA requirements, a chart, tape measure and his video camera to makes his observations on the Social Sciences Building.  As Plaintiff was doing his measurements, he was approached by an unnamed faculty member who told Plaintiff he was not allowed to be in the building.  The faculty member then summoned Defendant Gonzalez (Dean of the Social Sciences Department) who also advised Plaintiff he was not allowed to be in the building.  Plaintiff stated that he had authorized business in the building because he was completing an assignment for a class.  Three campus police arrived and followed Plaintiff for approximately 15 to 20 minutes, until Plaintiff left the building.

Plaintiff returned to the Social Sciences Building the following day to complete his survey.  As before, a faculty member notified Defendant Gonzalez who confronted Plaintiff and scolded him for being in the building.  Another faculty member, Defendant Jendian also approached.  A confrontation ensued wherein Plaintiff alleges Jendian was the aggressor but was accusing Plaintiff of threatening behavior.  Campus police were called and detained Plaintiff.  After review of the terms of the stay-away order, Plaintiff's authorized class project and the video tapes on the incidents on December 1 and December 2, Plaintiff was determined not to have violated any terms of his disciplinary probation.  However, Defendant

1   Oliaro issued a clarification of the stay-away portion of the Decision which required that

2   Plaintiff provide 24 hours notice of an intended presence in the area that is subject to the stay-

3   away order.  Plaintiff alleges that his detention was in violation of his rights under the Fourth

4   Amendment and that the imposition of the 24-hour notification requirement was in retaliation

5   for Plaintiff's outspoken political conservatism.

6         Plaintiff's action was commenced in the Superior Court of Fresno County on or about

7   November 14, 2012, and was removed to this court on December 12, 2012.  The currently-

8   operative FAC was filed on January 14, 2013.  The instant motion to dismiss was filed on

9   January 25, 2013.  Plaintiff filed his opposition to the motion to dismiss on February 19,

10   2013, and Defendants filed their reply on February 25, 2013.  The matter was taken under

11   submission as of February 28, 2013.

12                              **LEGAL STANDARD**

13         A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

14   can be based on the failure to allege a cognizable legal theory or the failure to allege

15   sufficient facts under a cognizable legal theory.  Robertson v. Dean Witter Reynolds, Inc.,

16   749 F.2d 530, 533-34 (9th Cir.1984).  To withstand a motion to dismiss pursuant to Rule

17   12(b)(6), a complaint must set forth factual allegations sufficient "to raise a right to relief

18   above the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)

19   ("Twombly").  While a court considering a motion to dismiss must accept as true the

20   allegations of the complaint in question, Hospital Bldg. Co. v. Rex Hospital Trustees, 425

21   U.S. 738, 740 (1976), and must construe the pleading in the light most favorable to the party

22   opposing the motion, and resolve factual disputes in the pleader's favor, Jenkins v.

23   McKeithen, 395 U.S. 411, 421, reh'g denied, 396 U.S. 869 (1969), the allegations must be

24   factual in nature.  See Twombly, 550 U.S. at 555 ("a plaintiff's obligation to provide the

25   'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a

26   formulaic recitation of the elements of a cause of action will not do").  The pleading standard

27

28                                          8

set by Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("Iqbal").

The Ninth Circuit follows the methodological approach set forth in Iqbal for the assessment of a plaintiff's complaint:

> "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

Moss v. U.S. Secret Service, 572 F.3d 962, 970 (9th Cir. 2009) (quoting Iqbal, 129 S.Ct. at 1950).

## DISCUSSION

Plaintiff's FAC alleges eleven claims for relief that appear to be organized around three different transactions or events. Plaintiff's first claim for relief alleges conspiracy to commit civil rights violations pursuant to 42 U.S.C. §§ 1983 and 1985. The remainder of Plaintiff's claims for relief allege various constitutional infringements in violation of 42 U.S.C. § 1983. Plaintiff's second and third claims for relief are based on the filing of complaints regarding Plaintiff's conduct in Torres and Lopes offices. Although Plaintiff's FAC is less precise than might be desired in setting forth the exact nature of the claimed violation, a fair reading of the second and third claims for relief reveals that Plaintiff is alleging the filing of the complaints was in retaliation for Plaintiff's exercise of First Amendment free speech rights in the second claim for relief and in violation of Plaintiff's rights against discrimination under the Equal Protection Clause of the Fourteenth Amendment in the third claim. The next three claims for relief – claims four, five and six – are in response to the informal judicial conference held on June 17, 2011, including the suggested settlement that was the product of that conference. Plaintiff's fourth claim alleges retaliation in violation of Plaintiff's free speech rights; claim five alleges violation of

9

Plaintiff's Equal Protection rights and the sixth claim for relief alleges violation of Plaintiff's procedural Due Process rights.  Plaintiff's seventh and eights claims for relief arise out of the formal judicial hearing held on September 13, 2011, including the Decision that was the product of that hearing.  Plaintiff's seventh claim alleges violation of Plaintiff Due Process rights based primarily on the denial of assistance of counsel at the hearing and the eighth claim for relief alleges that the product of that hearing, the Decision, resulted in the imposition of sanctions that violated Plaintiff's first amendment rights of free speech and association.  The ninth and tenth claims for relief pertain to the events of December 1 and December 2, 2011.  Plaintiff's ninth claim for relief appears to allege violations of Plaintiff's rights under the First, Fourth and Fourteenth amendments.  Plaintiff's tenth claim for relief appear to allege that the "clarifications" or modifications of the Decision imposed in the wake of the events of December 1 and 2, including the 24-hour notice requirement violated various aspects of Plaintiff's First Amendment rights.  Plaintiff's eleventh claim for relief is somewhat unclear, but it appears to relate to a letter that was sent to Plaintiff following an incident were Plaintiff was eating his lunch in area affected by the stay-away orders.

**I. Free Speech Retaliation**

At the outset it is important to note that Plaintiff's FAC appears to allege two different species of First Amendment free speech violations.  Plaintiff's second through seventh claims for relief are concerned primarily with First Amendment retaliation for *past* expressive conduct.  Plaintiff's later claims for relief, starting with the eighth, focus to an uncertain extent on the sanctions applied in the Decision and the extent to which those sanctions infringe *future* rights guaranteed under the First Amendment.  Because Plaintiff's second and third claims for relief allege that the filing of the complaints by Torres and Lopes were in retaliation for *past* expressive conduct, the court applies the analytical framework set forth in <u>Pinard v. Clatskanie School Dist.</u>, 467 F.3d 755 (9th Cir. 2006):

> To establish a First Amendment retaliation claim the student speech context, a plaintiff must show that (1) he was engaged in a constitutionally

10

protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.

Id. at 770.  The court accepts as true that Plaintiff's prior expressive conduct in support of his constitutional conservatism qualifies as constitutionally protected activity.  The court will return to the second element after considering first whether Plaintiff's FAC sets forth facts to show that Plaintiff's constitutionally protected speech was a substantial factor in Defendants' conduct.

### A. Plaintiff's Protected Expressive Activity Was Not a Motivating Factor

Although Plaintiff's FAC alleges multiple claims against multiple Defendants on multiple theories, at the base is a rather simple question: did Plaintiff's conduct in the offices of Torres and Lopes violate student codes of conduct such that the issuance of complaints and subsequent disciplinary actions were warranted; and, if so, does Plaintiff's FAC allege facts which show that the disciplinary actions were nonetheless undertaken for purposes of retaliation?  If Plaintiff's actions in the offices of Torres and Lopes were such that disciplinary action was warranted and there are no facts upon which an impermissible motive may be found, then the remainder of Plaintiff's claims are of doubtful merit.

In assessing whether Plaintiff's conduct warranted the imposition of sanctions, the first issue is what standards are appropriate to determine the limitations that may be justifiably established to limit student activity in areas, such as instructor offices, that are part of the instructional infrastructure of the campus?  "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."  Perry Educ. Ass'n v. Perry Local Educators' Assn., 460 U.S. 37, 44 (1983) ("Perry").  Both California and Federal courts have recognized there are three categories of public property for purposes of establishment of restriction on expressive activity.  See id. at 45 (describing three categories); San Leandro Teachers Ass'n v. San Leandro Unified School Dist., 46 Cal.4th 822, 838-839 (2009) ("San

11

Leandro Teachers") (describing three categories under California and Federal case law).  The first consists of "places which by long tradition or by government fiat have been devoted to assembly and debate . . . ."  Perry, 460 U.S. at 45.  The second category consists of "public property which the state has opened for use by the public as a place for expressive activity."  Id.  The third category consists of public property not in either of the first two categories.  This category of public property is commonly referred to as "the nonpublic forum."  San Leandro Teachers 46 Cal.4th at 839.

It is well established that a school campus is not different from other public property with respect to that authority of the institution to designate portions of its property that are, or are not, public fora.  See Perry, 460 U.S. at 46 ("We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government [Citation.]'  In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation in speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"); Orin v. Barclay, 272 F.3d 1207, 1215 (9th Cir. 2001) (recognizing that college might or might not choose to designate a quad as a "public forum"); Crosby v. South Orange County Cmty. Coll. Dist., 172 Cal.App.4th 433, 443 (4th Dist. 2009) (recognizing that community college had not established its library as public forum).

Plaintiff has alleged no facts from which the court could find or infer that the University has designated the office space of its faculty as public fora.  Pursuant to Perry, in nonpublic fora, a school may regulate expressive activity so long as the regulation is reasonable and not based on opposition by officials.  460 U.S. at 47.  In this regard, the authority of the University is quite broad.  See Souders v. Lucero, 196 F.3d 1040.1044 (9th Cir. 1999) ("In addition to the College administration's broad rulemaking power to assure that the traditional atmosphere is safeguarded, it may also impose sanctions on those who

12

violate the rules.") There is no allegation in Plaintiff's FAC that the rules established by the University are based on content; only that the content-neutral rules regarding expressive activity were enforced in this particular instance for reasons of retaliation for protected speech.

　　　　To test the adequacy of Plaintiff's allegation that the otherwise content-neutral rules were enforced in retaliation for the content of Plaintiff's expressive activity, the court first asks whether the facts alleged in the FAC indicate that a content-neutral reason existed for the issuance of complaints in this case.  Plaintiff concedes that he was charged with violation of "subsection (7) of § 41301 of Title 5, of the California Code of Regulations (conduct that threatens the health or safety of a person related to the University, including threats, intimidation or harassment).  With regard to Plaintiff's conduct, Plaintiff's FAC alleges that, after he witnessed Torres and Lopes complaining to each other that Plaintiff was "stalking" the hallway and that "'wanted'" signs with pictures of Plaintiff should be posted:

> [D]uring office and business hours Plaintiff approached Defendant Torres' office door which was open.  With video camera on, Plaintiff asked Torres if he had approved of the "America" "White Savage" poem published in that "La Voz" student newspaper.  Defendant Torres refused to speak to Plaintiff.  Nevertheless, Plaintiff calmly insisted on speaking to Torres about that poem.  Defendant Torres' reaction was to pick up his telephone and call the Fresno State Campus Police.
>
> Plaintiff then approached the open office door of Defendant Lopes and asked her the same series of questions, with his video camera running.  She refused to answer the questions, and when Plaintiff asked again, Lopes stated that she did not want to talk to [Plaintiff].  She went to the door, closed it, and called the Campus Police.

Doc. # 14 at 17:24-18:9.  Plaintiff alleges that the complaints filed by Torres, Lopes and Gonzalez falsely stated "that Plaintiff was threatening, was attempting to instigate a physical altercation, and that they felt threatened."  Doc. # 14 at 18:11-12.

　　　　Plaintiff's own description of events evinces an overall approach to political advocacy that is not unfamiliar to the court.  In this approach, which is used not infrequently by the champions of both the political left and right, the advocate devotes considerable effort to

what Plaintiff terms "outspoken expression" of views that he correctly interprets as being sharply contrary to those of the target audience.  Predictably, this engenders complaints; just as Plaintiff admits his outspoken opposition to the dominant narrative expressing sympathy for undocumented aliens has provoked complaints.  The advocate continues his outspoken opposition to the dominant narrative, often, as here, using increasingly intrusive methods until finally an official reaction is provoked.  The advocate then points to his outspoken contrariness and evidence of his unpopularity to show that the reaction he provoked is the result of impermissible bias against the *content* of his speech rather than the intrusive or harassing *manner* of his expressive activity.

While this approach may have some success in other contexts, it cannot succeed in this instance because Plaintiff, in provoking an official response to his expressive activities, clearly managed to step over the line that divides permissible from impermissible expression in a nonpublic forum.  Played against the backdrop of Plaintiff's admittedly "outspoken," continuous and apparently contentious campaign against what he perceives to be the dominant political climate, Plaintiff's attempt at in-your-face interviews with video camera going, and his failure to immediately desist when requested to do so is nothing short of harassment and at least attempted intimidation.  The key fact here is that there is no evidence the second floor of the Social Sciences Building and the faculty office spaces located there have been designated a public forum.  Any contention that the faculty's right to some measure of protection from harassment and intimidation must give way to Plaintiff's First Amendment rights is therefore without merit.

As something of an aside, to the extent that Plaintiff may contend that California law provides particularly protected status to Plaintiff's expressive conduct simply because it occurred on a college campus, that contention is contradicted by the decision in Crosby, which held that the limitations on expressive conduct imposed by Education Code section 66310 assures that students have the same expressive rights on campus as they would have in

a similar public space off-campus. Nothing more. Crosby, 172 Cal.App,4th at 437. Thus, any contention by Plaintiff that his rights of free expression under the First Amendment are at their "zenith" simply because they occur on a college campus are without merit.

The court is aware that the terms "harassing," "threatening" and "intimidating" imply subjective interpretation and are therefore imprecise. The court is also aware that it is Plaintiff's contention that his conduct was neither intimidating or harassing and that the video recording of the encounters would substantiate that "fact." The court finds, however, that in light of the University's "broad rulemaking power to assure that the traditional atmosphere [of the University] is safeguarded," Souders, 196 F.3d at 1044, the Defendants in this case are not burdened to show that Plaintiff's expressive conduct exceeded some objective boundary of intrusiveness before application of sanctions can be applied constitutionally. Two important policy considerations lead to this conclusion. First, the fortunately occasional and uniformly horrific instances of student violence on campus make it absolutely essential that the ability of faculty, staff, students or other members of the public to complain of conduct that they find *subjectively* unsettling cannot be impeded by the requirement that a certain objective standard of malice in the complained-of conduct must be demonstrated. Second, teaching, even at the college level, it not without significant stresses and it is a legitimate interest of college administrations that faculty members be empowered to control the stress placed on them as a result of rude, intrusive or verbally abusive conduct of students.

Given these policy considerations and the broad powers of collegiate institutions to fashion rules to safeguard the mental and physical well being of their faculty and staff, and given that the sanctions in question are not criminal in nature, the court concludes that the successful allegation of violation of "subsection (7) of § 41301 of Title 5, of the California Code of Regulations in the context of expressive conduct in a nonpublic forum, requires no more than the demonstration of facts that could plausibly support the subjective experience of harassment or intimidation. See Healy v. James, 408 U.S. 169, 193-194 (1972) ( a school

15

administrator may impose sanctions on expressive conduct that would not be permissible on citizens generally based on the reasonable needs of the school and the milder, non-criminal nature of the sanctions imposed).  To put it more succinctly, the court finds that Plaintiff's conduct was harassing and/or intimidating because the complaining faculty members stated that it was and because Plaintiff's admitted conduct makes the complaining parties' subjective assessment reasonable.  Plaintiff's actions, as admitted by Plaintiff in his FAC, provided a plausible basis for those complaints because Plaintiff confronted the faculty members with video recorder running and refused to immediately cease when asked to do so.

The court finds that Plaintiff's self-admitted conduct provided justification for Lopes, Gomez and Torres to make out complaints.  The court will not indulge Plaintiff's invitation to speculate that, notwithstanding a reasonable basis for making complaints, Lopez, Torres and Gomez were motivated by the content of Plaintiff's protected speech.  In the context of Plaintiff's aggressive and intrusive behavior, Plaintiff's admitted pattern of outspokenness and his admitted success at prompting complaints by others against himself goes to prove that Torres and Lopes were being honest when they claimed to have experienced subjective feelings of harassment and/or intimidation; not that they were motivated by bias against protected expressive activity.

### B.  Disciplinary Proceedings Were Not Motivated by Retaliation Against Plaintiff's Protected Free Speech

As noted above, the claims set forth in Plaintiff's FAC tend to be vague with regard to the legal bases for relief in the separate claims that are alleged.  However, to the extent allegations of First Amendment retaliation are expressed with regard to Defendants Welty, Oliaro, or Coon in Plaintiff's fourth through seventh claims for relief, those claims fail for the reasons that follow.

Plaintiff's fourth through eighth claims for relief are alleged against Defendants Welty, Oliaro and Coon and pertain to the informal conference that was held on June 17,

16

2011, and the formal hearing that was held on September 13, 2011, and to events occurring after the formal heaing.  The allegations set forth in these claims for relief allege or imply violation of Plaintiff's right against retaliation based on protected free speech, rights to procedural due process under the Fourteenth Amendment and equal protection rights under the Fourteenth Amendment.  The factual bases for Plaintiff's claim of violation of rights under the First Amendment are frankly difficult to discern.  Plaintiff's claims reference general factual allegations relating to the conduct of the hearings itself, and to the proposed "settlement" that Defendant Coon proposed after the informal hearing was conducted.  There is also a reference to what can only be termed investigative activity that occurred before the informal hearing.

The court is at a loss to see how investigation of one or more lawfully submitted complaints and hearings conducted on those complaints could possibly constitute a First Amendment violation against the subject of those complaints.  The FAC appears to suggest that the hearings would not have happened but for the intent of Welty, Oliaro and Coon to retaliate for Plaintiff's outspoken criticism of the Department's and the University's apparent support of immigrant students.  If this is Plaintiff's legal basis for allegation of violation of First Amendment rights, then the allegation is absurd on its face.  The complaints were submitted and, whether the complaints were factually sufficient or not, Defendants Welty, Oliaro and Coon had no reasonable choice but to investigate the complaints and hear Plaintiff's response.  Plaintiff also appears to object to the conclusion or conclusions reached as a result of the hearings and objects to the content of the suggested settlement and to the final decision.  Again no legal theory for First Amendment violation suggests itself other than the obviously unsupportable proposition that any official response to complaints lodged against that individual are actionable as being retaliatory.

While Plaintiff may assert cognizable claims related to certain aspects of the *conduct* of the informal (or formal) hearings on procedural due process grounds, Plaintiff has not

17

stated or even remotely suggested any legal basis for a First Amendment violation that could arise out of an investigation of, hearing on, or conclusion regarding, any complaint filed as a result of Plaintiff's conduct, expressive or otherwise.  If anything, a hearing, whether formal or informal, is by its nature a vindication of Plaintiff's First Amendment rights, not an abrogation of them.  This is true whether or not Plaintiff objects on due process grounds to the *conduct* of the hearing or hearings.  With regard to the suggested settlement, no allegation of First Amendment violation can arise from the conclusions reached as a result of the hearing because no sanctions were actually imposed until after the formal hearing.

The court concludes that the disciplinary procedure, including both formal and informal hearing, was motivated by the issuance of complaints by Torres and Lopes, which were, as previously discussed, a content-neutral response to Plaintiff's expressive conduct in a nonpublic forum.  The FAC offers no basis, other than rank speculation, for the proposition that bias against Plaintiff's constitutionally protected speech was a substantial factor in the disciplinary proceedings.

### C. Defendants' Actions Not Sufficient to Chill Free Speech

Plaintiff alleges that all of Defendants' actions, including the filing of complaints, the disciplinary proceedings and the sanctions themselves were for the purpose of retaliation for, and trying to silence, Plaintiff's expressive conduct.  The court finds no factual basis for that allegation in the FAC.  As discussed above, Plaintiff's conduct cause the filing of complaints which necessitated the disciplinary proceedings.  Since these procedures are broadly applicable to instances of allegation of student misconduct for any reason, it cannot be alleged that the purpose of the complaints or the disciplinary proceedings occasioned by the complaints were sufficient to cause a person of ordinary resolve to restrain from exercise of First Amendment rights.

The court also finds that the sanctions themselves were not sufficient to chill free speech.  As will be discussed in additional detail later, the sanctions contained essentially two

components; the stay-away orders and the "disciplinary probation."  The stay-away orders were narrowly crafted to limit Plaintiff's access to the areas that would likely be occupied by the faculty members and staff that felt threatened, harassed or intimidated by Plaintiff's expressive activities.  These areas are not public fora, so exclusion from these areas as sanction for misconduct does not offend any First Amendment right.  In addition, there is no evidence that the imposition of the Disciplinary Probation should have a chilling effect on Plaintiff's right to expressive activity because Plaintiff is not excluded from free expression in any forum that would otherwise be available to him.

The court concludes that the facts set forth in Plaintiff's FAC are insufficient, if proven, to demonstrate that Defendants actions in filing complaints or in carrying out the disciplinary proceedings or in issuing sanctions against Plaintiff would chill a person of ordinary firmness from continuing to engage in protected activity or to demonstrate that Plaintiff's  protected expressive activity was a substantial or motivating factor in Defendant's conduct.  <u>Pinard</u>, 467 F.3d at 770.  The court therefore finds that Plaintiff's claims two through eight do not allege facts to support relief based on the legal theory of First Amendment Retaliation.

**II.  Equal Protection Claims**

A number of Plaintiff's claims for relief allege, with greater or lesser clarity, violation of Plaintiff's rights of equal protection, presumably under the Fourteenth Amendment.[1]  The court need not determine whether Plaintiff, a self-described constitutional conservative, is a member of a suspect class.  In the context of speech rights, the equal protection analysis begins with the question of whether membership in a group burdens a fundamental right of

---

[1]      The court assumes Plaintiff's equal protection claims are pursuant to the Equal Protection Clause of the Fourteenth Amendment because the entity allegedly impinging on Plaintiff's First Amendment rights is the University, a state actor.  Analytically, it makes no difference whether Plaintiff's Equal Protection claims are alleged pursuant to the Fifth or Fourteenth Amendments since the same legal approach applies to both.  <u>Weinberger v. Wiesenfeld</u>, 420 U.S. 636, 638 n.2 (1975); <u>High Tech Gays v. Defense Indus. Security Clearance Office</u>, 909 F.2d 375, 378-379 (9th Cir. 1990).

free speech.  Perry, 460 U.S. at 54.  It is only when "rights of access associated with a *public forum* are improperly limited [that] we may conclude that a fundamental right is impinged." OSU Student Alliance v. Ray, 699 F.3d 1053, 1067 (9th Cir. 2012) (italics added); see Montery County Democratic Central Comm. v. United States Postal Serv., 812 F.2d 1194, 1200 (9th Cir. 1987) (the viability of an equal protection claim "is contingent on the existence of a public forum").  Because the court has determined that Plaintiff has failed to adequately allege violation of any right against First Amendment retaliation in claims two through eight, any equal protection claim that is alleged on the basis of First Amendment retaliation is without merit.

Plaintiff's also appears to allege violation of equal protection rights based on what he alleges is unequal application of rules limiting free speech.  Specifically, Plaintiff alleges other students – students whose views are politically more in line with those of Defendants – staged one or more demonstrations, gatherings, protests or other group expressive conduct in the same area on the second floor of the Social Sciences Building without reprimand or sanction.  Plaintiff contends that the selective application of restrictions on his expressive conduct was the result of his membership in a group who espouse political views contrary to those expressed by the student demonstrators in violation of Plaintiff's right to equal protection.  This does not alter the court's analysis.

In putting the focus on the differential application of sanctions, Plaintiff loses sight of the reason for the application of sanctions in his case.  Plaintiff was not sanctioned because he occupied space and engaged in expressive conduct on the second floor of the Social Sciences Building; he was sanctioned because he committed acts that reasonably support the complaints of harassment or intimidation by Torres and Lopes and because the complainants stated they subjectively experienced harassment and/or intimidation.  It is entirely possible that the student demonstrators who engaged in acts of occupation of the second floor offices spaces were equally or more disruptive to the academic ambiance of the area.  It is also quite

20

possible that Defendants Torres and Lopes did not complain because they felt sympathy for the demonstrator's point of view and as a consequence did not subjectively feel harassed or intimidated.  No equal protection violation can arise from the difference in Torres' and Lopes' subjective responses to Plaintiff's expressive conduct because the area where the conduct occurred is not a *public forum*.  Because the area is not a public forum, rules that differentiate on the basis of the subjective experience of those who are being protected are permissible even though the subjective experiences may be, to some extent, dependent on feelings arising as a result of the content of the speech.  Contrary to Plaintiff's assertion, in a nonpublic forum a student's right of speech is not at its zenith; is subject to regulation that is dependent on the extent to which faculty, staff or teachers find the expressive conduct subjectively threatening, harassing or intimidating.

The court concludes Plaintiff's claims of violation of equal protection rights, whether based on Plaintiff's allegations of Free Speech retaliation, restrictions on Plaintiff's access to the nonpublic forum, or on differential application of sanctions, are without merit.  Those claims will be dismissed with prejudice.

**III.  Procedural Due Process Claims**

Plaintiff's procedural due process claims appear to be grouped around three sets of facts.  First, Plaintiff contends that the denial of assistance of counsel at both the informal and formal proceedings violated his due process rights.  Second, Plaintiff alleges Defendants failed to consider best evidence, both with respect to the informal and formal proceedings.  This includes failure to give consideration to Plaintiff's video recording and failure to call witnesses designated by Plaintiff to support his claims that he did not engage in harassing or intimidating conduct.  Also related to the issue of best evidence, Plaintiff contends Defendants failed to provide requested "copies of the reports made by all students, staff, and administrators about Plaintiff," which were needed to provide Plaintiff with the best evidence to show the level of bias against him.  Doc. # 14 at 19:25-20:1.  Plaintiff contends the

21

requested information was relevant to show widespread and deep bias against Plaintiff's political viewpoints.  The third group of facts pertain to the issuance of the Decision. Plaintiff alleges he was not provided a copy of the Decision in advance of the imposition of its terms so that he did not have an opportunity to object to its contents.  Although it is not entirely clear from the pleadings, it appears that Plaintiff also alleges violation of his procedural due process rights as a result of the so-called "clarification" of the terms of the stay-away orders that were imposed following the events of December 1 and 2, including the imposition of the 24-hour notice requirement.

### A.  General Considerations

"The Fourteenth Amendment's guarantee of due process applies when a constitutionally protected liberty or property interest is at stake. [Citation.]"  <u>Matthews v. Harney County, Oregon, School Dist. No. 4</u>, 819 F.2d 889, 891 (9th Cir 1987) (citing <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972) ("<u>Roth</u>")).  Plaintiff's FAC does a less-than-optimum job of making explicit the protected interest that were at stake as a result of the informal and formal disciplinary proceedings.  The facts alleged in Plaintiff's FAC imply that suspension was never under consideration as consequence of the proceedings nor was there consideration of any sanction that would burden Plaintiff's progress toward the fulfilment of the degree requirements for his chosen course of study.  The court therefore finds that Plaintiff has not alleged that property interests were at stake.

On the other hand, Plaintiff places a great deal of emphasis on the importance of his rights under the First Amendment.  To a great extent, Plaintiff's contentions regarding the process he was due is intertwined with his contention that suffered First Amendment retaliation.  Plaintiff's reasoning, a the court understands it, is that since the entire disciplinary process is the product of First Amendment retaliation intended to chill Plaintiff's free speech rights, he was entitled to an enhanced level of process to assure against the loss of a fundamental constitutionally protected right.  However, since the court has determined that

22

Plaintiff's claims of First Amendment retaliation are without merit, it is clear that nothing more was at stake in the disciplinary process than the determination of fitting sanctions for garden-variety student misconduct.  Thus, the process that was due in the instance of the disciplinary process is the process that is constitutionally sufficient for run-of-the-mill school disciplinary proceedings where there are no fundamental constitutional rights in the balance.

"Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  The minimum of due process that arises from the interference with a property or liberty interest is "notice and an opportunity for hearing appropriate to the nature of the case." Goss v. Lopez, 419 U.S. 565, 579 (1975). In the context of disciplinary proceedings involving student conduct on campus, the Goss court recognized that schools must balance the imposition of due process requirements that may burden both the school's administrative resources and intrude on the legitimate use of discipline in the teaching process with the student's interest in not being subject to loss of liberty or property rights as a result of mistake or misunderstanding. See generally id. at 579-583 (discussing balancing interests in the context of sanctions involving short suspension).

Plaintiff argues strenuously that he was entitled to more than the minimum of notice and an opportunity to be heard because the First Amendment liberty interests of students are "at [their] zenith" and because the imposition of disciplinary sanctions has no instructive value in the context of a university.  Doc. # 22 at 16:11-16.  The court disagrees on both counts.  First, as discussed above, the expressive conduct that resulted in the complaints against Plaintiff occurred in an area that is a nonpublic forum.  For that reason any expressive conduct, even otherwise important political speech, is legitimately subject to content-neutral rules that are aimed at preserving decorum and shielding those in the vicinity from apprehension, harassment and unwanted intrusion.  Thus, the liberty interests that Plaintiff can claim under the First Amendment in a nonpublic forum are, if not de minimus, then certainly short of important fundamental rights requiring strict scrutiny.

Second, the University has a very strong interest in maintaining a disciplinary process that can address concerns of student misconduct that arise from expressive student conduct, particularly in the context of nonpublic fora on campus.  Plaintiff argues that his speech, no matter how offensive or grating it might be to the listener, must be tolerated because the sensibilities of listeners in a college context must give way to the First Amendment rights of the speaker.  As the court has indicated above, this is simply not the case in a non-public forum.  In a non-public forum, the University has authority to protect the sensibilities of listeners, whether faculty, staff or other students, from feelings of intrusion, harassment or threat without regard to viewpoint.

The court finds that under the facts of this case, where the sanction of suspension was neither contemplated nor imposed and the only liberty interest at stake was no more than the attenuated right of Plaintiff to engage in expressive conduct in a nonpublic forum, no more that the minimum elements of due process – notice and the opportunity to tell one's side of the story – is required.  In Plaintiff's seventh and eighth claims for relief there are a number of specific allegations regarding what evidence Plaintiff was or was not allowed to present (including the video recording), who Plaintiff was not allowed to cross-examine, who was allowed to testify, and in general the obstacles that prevented Plaintiff from supporting his theory that the entirety of the complaints and proceedings were undertaken for retaliatory reasons.  The court will not address each contention specifically but will discuss some of the more prominent contentions below.

### B.  Assistance of Counsel

Defendants cite, most prominently, Goss, 419 U.S. at 583 for the proposition that procedural due process does not require that a student facing disciplinary action for violation of school rules of conduct be afforded a full adversarial proceeding, including the right to secure assistance of counsel.  See Doc. # 18-1 at 13:9-15 (quoting relevant section of Goss).  Plaintiff expends considerable effort in factually differentiating Goss and other case authority

24

cited by Defendants, but fails to provide any case authority himself to support the proposition that the University's policy of excluding private counsel from the formal or informal hearings constituted a due process violation in Plaintiff's case.  Plaintiff's basic argument is that, where important First Amendment rights are at stake, a greater degree of procedural rigor is warranted.

The consistent theme running through Plaintiff's FAC is that Plaintiff's First Amendment rights of free speech are implicated in the complaints against him by Torres and Lopes, in the formal and informal proceedings and in the sanctions imposed.  As discussed above, Plaintiff's First Amendment rights are not implicated in this case because Plaintiff's expressive conduct did not occur in a public forum.  There is nothing about the facts of this case that suggest that the due process standards outlined in Goss are in any way inappropriate for purposes of the proceedings to which Plaintiff was subjected.

The court concludes that University's policy barring participation of counsel at Plaintiff's formal and informal proceedings did not infringe on Plaintiff's due process rights.

### C. Best Evidence

Plaintiff alleges that those conducting the hearings, both informal and formal, failed to avail themselves of the opportunity to consider evidence, principally in the form of his video recordings and the testimony of a campus security officer, that Plaintiff' had not conducted himself in a manner that was threatening, harassing or intimidating.  Plaintiff also alleges that he was denied access to, or the opportunity to present, evidence showing that Defendants Torres, Lopes and Garcia harbored bias against Plaintiff based on the content of his expressive activity.  Plaintiff's argument fails because the expressive conduct that was the subject of the hearings occurred in a nonpublic forum and, consequently, any evidence that might have been relevant to establish the bias of those who complained of Plaintiff's conduct is irrelevant.  As discussed above, because Plaintiff's conduct occurred in a nonpublic forum, all that is relevant to the determination of whether sanctions may be applied is whether the

complainants – Torres and Lopes – *subjectively* experienced harassment, threat or intimidation and whether Plaintiff's conduct was such that a reasonable person might interpret the conduct in that way.  Thus, only two paths of inquiry are relevant.  What did Plaintiff actually do and/or say and what was Lopes' and Torres' subjective reaction?

Since Plaintiff admits that he approached both Torres and Lopes with his video camera running and refused to turn the camera off and leave the offices of the complainants when asked to do so, the court has no basis to conclude that the video recordings Plaintiff alleges were exculpatory would have shown anything to the contrary.  A moment of reflection reveals that being approached by someone with a video camera who is recording without consent is inherently intrusive and intimidating.  As the court has previously stated, it finds that the facts that Plaintiff himself alleges (and that the video recordings would not have contradicted) – that he approached Lopes and Torres with video camera running and refused to stop recording and leave when told to do so – are sufficient to warrant application of sanctions for violation of codes of conduct prohibiting behavior that is threatening, intimidating or harassing.  Whether another person, perhaps a person less sensitive to such intrusions or one without a history of confrontation with Plaintiff or his ideas, would have found the interchange between Plaintiff and Torres and Lopes non-threatening or non-harassing is entirely irrelevant.

The court finds that those facts that Plaintiff alleges were excluded to his detriment were not relevant.  The court finds that Plaintiff's due process rights were therefore not offended by the failure of the formal and informal hearing bodies to give consideration to other information to prove Plaintiff's subjective intent to be respectful or to prove the subjective reactions of others to his conduct.

### D.  Formal Hearing Conduct, Failure to Provide Hearing Report, Sanctions

Plaintiff's eighth claim for relief also sets forth a number of separate allegations that appear to be aimed at supporting three contentions regarding the outcome of the formal

hearing.  First, Plaintiff contends he had a right to review the hearing officer's report from the formal hearing and to prepare objections thereto.  Second, Plaintiff contends Defendant Coon was without authority to issue the sanctions because they were imposed in retaliation for Plaintiff's outspoken conservatism.  Third, Plaintiff contends the terms of the sanctions are constitute impermissible infringement of Plaintiff's First Amendment rights of speech, travel and association.  The court has discussed the issue of retaliation and need not address that issue again.  The court will briefly address Plaintiff's contentions regarding opportunity to review the Decision and the constitutionality of the sanctions imposed.

The failure of Defendant Coon or any other Defendant to provide Plaintiff with a copy of the hearing officer's Report does not constitute an infringement of Plantiff's procedural Due Process rights.  Plaintiff admits he was informed that the Report would be provided to Defendant Welty who would issue the Decision which would be final and non-appealable.  Plaintiff does not allege that his version of facts and his contentions were not represented in the Report.  It is also clear that the imposition of sanctions pursuant to the Decision is not akin to a criminal sentencing and Plaintiff does not point to any authority that suggests that an opportunity to object to the report or have a debate on its contents is a due process requirement.  Plaintiff alleges in the FAC that the Report, which he received through the Public Records Act, was "replete with inaccuracies and blatant manipulation of the 'evidence' and showed that Plaintiff violated five other provisions of § 41301."  Plaintiff does not allege what the inaccuracies were or whether or how those inaccuracies may have been prejudicial with regard to the Decision.  Since Plaintiff's due process rights consist of his opportunity at the hearing to tell his side of the story and since there is no indication that Plaintiff was hindered from his own participation, the court cannot see how any constitutional right is prejudiced by the failure of the hearing officer or other official to provide a copy of the hearing report.

Plaintiff's contention that the sanctions themselves infringe on rights guaranteed

under the First Amendment are similarly without merit.  There are two considerations that lead to this conclusion.  First, the terms of the sanctions do not intrude significantly into any constitutionally protected interest and second, such minor intrusions into constitutionally protected interests as may be found in the terms of the sanctions were imposed in accordance with the requirements of due process.

There are essentially three parts to the sanctions applied to Plaintiff; the stay-away orders, the imposition of "disciplinary probation," and later, the imposition of a requirement to provide 24-hours of notice prior to being present at any of the areas affected by the stay-away orders.  The stay-away orders limit Plaintiff's access to and conduct around the CLA faculty, the second floor of the Social Sciences Building and the parking area associated with the Social Sciences parking area except to the extent that Plaintiff may have an appointment with a person or a class in the restricted areas.  Plaintiff does not allege facts to indicate that any of these areas are public fora.  Simply put, Plaintiff cannot claim violation of a First Amendment right if he is excluded from a place that he has no constitutionally protected right to be.  As discussed at length above, if the areas involved are not established as public fora within the meaning set forth in Perry, a school may impose restrictions to access as it deems necessary to secure valid educational or safety goals so long as the restrictions are not imposed on the basis of content of expressive activity.  See Souders, 196 F.3d at 1044 (college's has broad authority to make rules regarding use of nonpublic fora and may impose sanctions further restricting access on those who violate the rules).

Plaintiff's opposition to Defendants' contention that the conditions imposed in the sanctions did not violate any constitutionally protected right consists primarily of the contention that the sanctions are unlawful because they were imposed in retaliation for protected speech.  The court again emphasizes that Plaintiff's contention that bias against his political beliefs were the cause of the complaints and the resulting sanctions fails as a matter of law because Plaintiff admits to conduct - confronting faculty members in their offices with

video camera running and refusing to cease recording and leave when told to do so – that is sufficient to establish the violation he was sanctioned for committing.  Since the court has rejected Plaintiff's contention that his sanctions are the imposed for reasons related to content, there is no constitutionally protected interest that is violated by the stay-away orders. Similarly, to the extent those orders were clarified after the events of December 1 and 2, to include the requirement for 24-hours notice, no constitutionally guaranteed right is implicated in the clarification because no constitutionally guaranteed right is implicated in the underlying stay-away orders.

With regard to the imposition of "disciplinary probation," the primary consequence of the sanction from Plaintiff's perspective is that he was prevented from holding an office in the Fresno State student government or in any University-recognized student organization, including the Fresno State chapter of Young Americans for Liberty, which he founded. Significantly, Plaintiff's FAC does not allege that Plaintiff was denied access to any public forum that would otherwise have been available to him without the disciplinary probation. So far as can be inferred from the FAC, under the conditions imposed by disciplinary probation, Plaintiff was free to participate in the activities of any student organization, to associate with its members, and to engage in expressive conduct to and through any student organization to the same extent as any other student.  Plaintiff was only prevented from holding office during the probationary period.  Further, Defendants correctly point out that there is no constitutionally protected property interest in extra-curricular activities generally and in student government office in particular.  See Flint v. Dennison, 488 F.3d 816, 835-836 (9th Cir. 2007) (finding constitutionally valid application of regulation barring student from assuming office in student government for campaign over-spending); Spath v. Nat'l Collegiate Athletic Ass'n, 728 F.2d 25, 28 (1st Cir. 1984) (no fundamental right to play on sports team).

In Sum, the court cannot find any indication that the sanctions imposed on Plaintiff

infringed on a fundamental Due Process or First Amendment right.  The court finds that University, through its officials, including Defendants Welty and Oliaro were justified in imposing sanction on Plaintiff, that those sanctions were narrowly tailored to prevent the sort of conduct that brought about the complaints against Plaintiff, that the imposition of the sanctions were undertaken following hearing procedures that adequately addressed Plaintiff's due process rights, and that the sanctions themselves did not intrude on any constitutionally protected right under the First or Fourteenth Amendments.  The court therefore finds that all claims for relief that can be interpreted as arising from the formal and informal hearing process and from the resulting imposition of sanctions on Plaintiff are without merit; including specifically Plaintiff's sixth, seventh and eighth claims for relief.

### III.  Claims Arising From Events on December 1 and December 2, 2011

Plaintiff's ninth and tenth claims for relief allege that Plaintiff had undertaken a project as part of a class to do a survey of the Social Sciences Building and to report on the building's architectural compliance with the ADA.  On December 1, 2011, a faculty member confronted Plaintiff on the second floor of the Social Sciences Building.  Plaintiff informed the faculty member Plaintiff had legitimate school business on in that location.  Defendant Gonzales called campus police who came and followed Plaintiff until he left the building. The following day, Plaintiff returned to the second floor of the Social Sciences Building to complete his survey.  Defendant Gonzales again confronted Plaintiff and requested that campus police be called.  Defendant Jendian also confronted Plaintiff.  When campus police arrived, Defendant "Jendian falsely advised the Campus Police that Plaintiff as accosting and threatening Jendian and that Jendian feared for his safety, and the Campus Police continued to detain Plaintiff while they pursued their investigation."  Doc. # 14 at 58:6-9.  Plaintiff called his counsel who stated that he would bring a copy of the Decision to show campus police the terms of the stay-away orders.  It is not clear if Plaintiff was removed from the building and remained in custody until his attorney arrived or whether he left the Social

Sciences Building out of custody.  In any event, Plaintiff's attorney arrived and delivered a copy of the Decision to the campus police.

Plaintiff contends the detention by campus police violated his Fourth Amendment right against unreasonable seizure.  "The detention of a suspect under [Terry v. Ohio, 392 U.S. 1 (1968)]  is evaluated against a standard of reasonableness under the totality of the circumstances. [Terry, 392 U.S. at 19; see also United States v. Sharpe, 470 U.S. 675, 685 (1985)] ('Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.'). To determine whether the stop was reasonable, we must consider 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Christian, 356 F.3d 1103, 1105-1106 (9 Cir. 2004) (quoting Terry, 392 U.S. at 20.

The court infers from Plaintiff's FAC that plaintiff was not arrested, that no force was employed, that there was no search of Plaintiff's person or property and that Plaintiff was released from detention shortly after he telephoned his attorney.  Lacking any information to the contrary, and making all reasonable inferences in Plaintiff's favor, the court infers that Plaintiff was subject to a brief detention, commonly referred to as a "Terry stop."  The general rule under Terry is that brief police detention is constitutionally justified if the detaining officer has "reasonable suspicion" that criminal activity may be afoot.  Aquilera v. Baca, 510 F.3d 1161, 1168 n.4 (9th Cir. 2007).  Campus police, having been summoned to the scene and having been told by the faculty that Plaintiff was not allowed to be present on the second floor, had reasonable suspicion that Plaintiff was in violation of valid stay-away orders.  Their brief detention of Plaintiff was therefore constitutionally lawful.

Plaintiff alleges that Defendants Gonzales and Jendian are liable for Plaintiff's brief detention because their decision to summon police was in retaliation for Plaintiff's exercise

of first amendment rights.  It is not clear whether Plaintiff is alleging that Gonzales and Jendian are liable for causing the violation of Plaintiff's rights under the Fourth Amendment, or whether Plaintiff's claims against Gonzales and Jendian are confined to allegations of First Amendment retaliation.  To the extent Plaintiff may intend to assert claims against Gonzales and Jendian for a Fourth Amendment violation, that claim is defeated because Gonzales and Jendian did not detain Plaintiff.  Plaintiff does not allege that Defendants Gonzales or Jendian were provided copies of the Decision and, given that Plaintiff's allegations demonstrate the University is generally mindful of students' privacy concerns, it is reasonable to assume that neither Defendant was apprized of the details of the sanctions.  Since Gonzales and Jendian had a reasonable basis to believe that Plaintiff was not permitted to be on the second floor, they had a reasonable belief they were authorized to demand his departure.  Thus, to the extent that Gonzales and Jendian can be said to have caused Plaintiff's brief detention, they share with the detaining officers the reasonable suspicion that Plaintiff was unlawfully present justifying the detention.

Plaintiff's ninth and tenth claims for relief strongly suggest, but do not explicitly state, that the legal theory behind the claims of infringement of First Amendment rights are retaliatory; that is, that the Defendants' actions are not necessarily violative of Plaintiff's right to speak freely in the nonpublic forum that constitutes the second floor of the Social Sciences Building, but rather are punishment for Plaintiff's prior exercise of free speech rights in other, presumably public, fora.  The facts set forth in Plaintiff's FAC evince the same strategy Plaintiff employed with regard to the events of May 11, 2011.  That is; Plaintiff, having been subjected to stay away orders as part of the sanctions, decides to deliberately probe the boundaries of conduct that might be allowed under those sanctions until a reaction is provoked and then Plaintiff seeks to leverage the reaction into another cause of action.  There is no evidence from the complaint to indicate that Plaintiff could not have chosen a different building for his extra credit ADA survey and could have avoided

another confrontation thereby.  But choosing the path of confrontation on December 1 and 2 will avail Plaintiff no more than it did previously in the context of the events of May 11.

Plaintiff's self-admitted conduct justified the restriction of Plaintiff's access to the nonpublic forum of the second floor of the Social Sciences Building as designated in the stay-away orders.  The point of the stay-away orders was to protect faculty and staff in their offices and environs from the harassment and intimidation evinced by Plaintiff's insistently video recording and questioning them.  That Plaintiff may have had technical *permission* to be on the second floor does not mean that he had a constitutional *right* to be there any more than that right existed before.  To the extent the second floor was a nonpublic forum before December 1, it remains so afterward and when Defendants Gonzales and/or Defendant Jendian instructed Plaintiff to leave, no *constitutional* right was infringed for the same reasons no constitutional right was infringed when Plaintiff was removed on May 11.  When told to leave, Plaintiff was obliged to leave and, if desired, to work out the terms of his presence on the second floor at the later time under more explicit terms acceptable to all.

Contrary to Plaintiff's contention, the facts of this case provide no basis of proof  that he was singled out for punishment and retaliation because of his politically conservative views.  Plaintiff's self-admitted *behavior* was content neutral regardless of his motivation at the time.  Plaintiff cannot escape the simple fact that his persistent and apparently successful efforts to arouse reaction in others means there is absolutely no reason to conclude that the reaction he has provoked in others has anything to do with his personal views.  This includes the actions by Gonzales and Jendian on December 1 and 2 resulting in Plaintiff's removal from the second floor of the Social Sciences Building.   Again, the court concludes that Plaintiff has failed to show First Amendment retaliation because he has failed to show that the treatment to which he was subjected was occasioned by expressive conduct protected by the First Amendment.

**IV.  Plaintiff's Eleventh Claim for Relief**

Plaintiff's eleventh claim for relief is, like the other ten claims, vague as to its legal basis and replete with irrelevant allegations.  However, the gist of the claim appears to be that at the beginning of the Spring Semester of 2012, Plaintiff's attorney called Campus Police to provide 24 hours notice that Plaintiff would be on the second floor of the Social Sciences Building on for two courses.  Apparently one or both of the classes was scheduled around midday, so Plaintiff went to the second floor shortly before class to eat lunch.  While eating, a faculty member told Plaintiff that Plaintiff was not allowed to be there.  The faculty member notified Defendant Gonzales that Plaintiff was present and Gonzales then contacted campus police to have Plaintiff removed.  There is no allegation that campus police responded or that Plaintiff left the area before going to his class.  Apparently Gonzalez notified Defendant Oliaro that Plaintiff was present prior to class eating lunch.  Defendant Oliaro sent Plaintiff a letter on January 24, 2012, which Plaintiff summarizes as follows:

> Defendant Oliaro then sent a letter to Plaintiff on January 24, 2012, condemning and retaliating against Plaintiff, by stating that Plaintiff had to abide by the 100 foot distance from the CLS faculty or staff, offices or classrooms until he was actually attending said class, but did not advise, and refused to respond to questions pertaining to, when is it too early to go to class, how long after class ends must Plaintiff travel beyond the 100 foot barrier, and challenging Defendant Oliaro for Oliaro constantly providing a moving target as to the sanction order.

Doc. # 14 at 62:7-13.

It does not appear that Plaintiff is alleging that the letter from Oliaro or the clarification of the 100-foot stay sanction to include time up to and immediately following class time constitutes a violation of a constitutional right in and of itself.  Rather, it appears to be Plaintiff's contention that the letter from Oliaro is another example of retaliation against Plaintiff because of Plaintiff's conservative political views.  As previously noted, Plaintiff admits he provided reason on more than one occasion to cause Defendants to revise and clarify the fine points of those orders.  It is neither punishment or prejudice to provide the clarification to the orders when the situation requires.  In the context of letter of January 24,

Defendant Oliaro insisted on nothing more than strict obedience to the previously-imposed term requiring Plaintiff to stay 100 feet away from the designated area except as required to be physically present to attend classes.

**V.   Qualified Immunity**

Defendants contend that all individual Defendants are entitled to qualified immunity. To determine whether qualified immunity applies, the threshold question is whether , in the light most favorable to the party asserting injury, the facts show an officer's conduct violated a constitutional right.  Saucier [v. Katz, 533 U.S. 194, 201 (2001)]; Robinson v. Solano County, 278 F.3d 1007, 1012 (9th Cir. 2002) (en banc).  If no constitutional right was violated, immunity attaches and the inquiry ends.  Saucier, 533 U.S. at 201.  If a constitutional right  would have been violated were a plaintiff's allegations established, the next step is to ask whether the right was clearly established in light of the context of the case. Id.  Finally, the contours of the right must be clear enough that a reasonable officer would understand whether this or her acts violate that right.  Id. at 202.

The court agrees that qualified immunity extends to all defendants because Plaintiff's FAC fails to set forth facts to show that any constitutionally protected right was infringed by any Defendant at any time during the events that comprise Plaintiff's FAC.

**V.   Leave to Amend**

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986).  The entirety of Plaintiff's action suffers from a single, fatal flaw; Plaintiff's own version of the facts show that he violated a code of conduct that provided a content-neutral basis for school faculty and officials to regulate, limit and sanction expressive conduct that is subjectively found to be harassing, intimidating or threatening.  Because Plaintiff's expressive conduct occurred in a

nonpublic forum and because the admitted facts of the conduct support the subjective finding of harassment or intimidation, the application of sanctions to punish past conduct and to reasonably limit future offensive conduct violates no constitutionally protected right. Further, qualified immunity applies to bar any claims arising from the actions of all Defendants who acted under color of law.  The court cannot envision any set of facts Plaintiff could plead that would change this analysis.  Leave to amend will therefore not be granted.


        THEREFORE, for the reasons discussed, it is hereby ORDERED that Defendants' motion to dismiss Plaintiff's FAC is hereby GRANTED.  Plaintiff's FAC is hereby DISMISSED in its entirety as to all Defendant with prejudice.


IT IS SO ORDERED.

Dated:    May 22, 2013                        _____

                                                            SENIOR  DISTRICT  JUDGE